**Thomas J. McLAIN, Appellant,**

v.

**CAROLINA POWER & LIGHT COMPANY, Appellee.**

No. 8124.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 7, 1960.

Decided Feb. 15, 1961.

See also 172 F.Supp. 273.

William E. Chandler, Jr., Columbia, S. C., for appellant.

David W. Robinson, Columbia, S. C. (A. Y. Arledge, Raleigh, N. C., on brief), for appellee.

Before SOBELOFF, Chief Judge, BOREMAN, Circuit Judge, and LEWIS, District Judge.

BOREMAN, Circuit Judge.

Thomas J. McLain, an experienced electrical construction worker, was employed by Sumter Builders, Inc., which company was, at the time of the plaintiff's accident, building a three phase, 12,000 volt power line (or lines) for the defendant, Carolina Power & Light Company, at Bethune, South Carolina. During the construction McLain was seriously injured when he came in contact with an energized electric wire, known as a "hot" wire.

Under the South Carolina Workmen's Compensation Act, Code 1952, § 72–1 et

seq. McLain collected full benefits for his injuries from his employer's workmen's compensation insurance carrier. Subsequently, he brought this action charging that his injuries were caused by the negligence of Carolina Power & Light.

A jury trial was had and when the presentation of evidence of both plaintiff and defendant had been concluded Carolina Power moved for a directed verdict in its favor upon the four following grounds: (1) The institution of the action was not authorized or consented to by Sumter's insurance carrier; (2) since the construction and rebuilding of power lines was a part of the trade or business of Carolina Power, McLain was limited to his recovery under the Workmen's Compensation Act; (3) there was no proof of actionable negligence on the part of Carolina Power; and (4) McLain's injuries were due solely to his contributory negligence. The District Court granted the motion and directed a verdict for the defendant on grounds 2 and 3.

We have carefully examined the pleadings, orders, exhibits and the transcript of testimony. Concluding that we must affirm the action of the District Court in directing a verdict on ground 3, because of the absence of proof of actionable negligence, all other asserted grounds become moot.[1]

Carolina Power is an electric utility engaged in the manufacture, transmission and distribution of electric power in the eastern portion of South Carolina. In 1951 Carolina Power was requested to furnish additional power line service to the Radcliff cotton gin in Bethune, South Carolina. At that time the gin was serviced by a single 12,000 volt power line and Carolina Power intended to erect the lines necessary to complete a three phase service to increase the power supply to the gin. Sumter entered into a contract to do the construction and installation work for Carolina Power.

The evidence clearly disclosed that, prior to the making of the contract with Sumter, Carolina had two 12,000 volt power lines extending from a switch (hereinafter referred to as "the switch") on a pole on U. S. Highway No. 1 in Bethune in a southerly direction to Main Street; thence in a westerly direction to the intersection of Main and Chestnut Streets; and thence in a northerly direction to the intersection of Chestnut and Blackman Streets. From this juncture in the two line service, a single 12,000 volt line extended in an easterly direction along Blackman Street to what is described as pole No. 116 which is at the intersection of Blackman and Calhoun Streets, and from that point continuing along Blackman Street to the gin. From pole No. 116 a 12,000 volt line extended in a northerly direction along Calhoun Street. Sumter was to construct a single 12,000 volt line between the two existing lines starting at the switch and extending southerly to Main Street; thence between the existing lines in a westerly direction to the intersection of Main and Chestnut Streets, and from that point in a northerly direction along Chestnut Street to the intersection of Chestnut and Blackman Streets. From this last mentioned street intersection, Sumter was to construct two new lines, one on either side of the existing single 12,000 volt line to pole No. 116, and thence to the cotton gin.[2]

On the morning of August 21, only two days after McLain had been employed as a member of the work crew for the project, the single line from the switch pole had been strung and the two new power lines had been strung along the crossarms of the line poles on Blackman Street but had not yet been "tied" to all of the insulators on the crossarms. The two existing lines from the switch along Highway No. 1 and along Main and Chestnut Streets had remained energized, as well as the single line along Black-

---

1. See Jaffke v. Dunham, 1957, 352 U.S. 280, 77 S.Ct. 307, 1 L.Ed.2d 314.

2. The Work Order followed by Sumter, introduced in evidence by Carolina Power and identified as Exhibit D–B, shows clearly the new lines to be constructed.

man Street, so as to maintain uninterrupted electric service to Bethune and to the gin. The two new power lines being installed along Blackman Street were to remain unenergized until the completion of their installation. The switch controlled the flow of electric current into the two old existing lines and into the single line extending along Blackman Street to the gin and would eventually control the flow of electricity into the two new power lines being installed on Blackman Street. It was clearly understood by Sumter that these existing lines would remain energized and hot during the new construction so that electric service to customers could be maintained as usual, of which fact McLain was fully aware.

At the time McLain was injured he was engaged in tying the two new power lines to the insulators on the top crossarms of pole No. 116. In addition to the two new lines being installed, there were four existing hot lines connected to insulators on this pole. One was the 12,000 volt power line on the top crossarm servicing the gin. The second was a "jumper wire" running from this 12,000 volt line down the pole, fifteen inches from it and parallel to it, to the lower crossarm of the pole. The third was a wire on the lower crossarm connected to this jumper wire and which extended from that point along Calhoun Street. The fourth was the street lamp wire which was generally energized only at night.

The top crossarm of this pole No. 116 was approximately eight feet long. The single existing hot line was situated near the middle of the top crossarm and the two new power lines were to be tied to insulators approximately two to two and one-half feet on either side of the hot line. McLain commenced the tying operation on the side of the pole nearest the gin. He first covered the energized 12,000 volt single line with a protective rubber covering for a distance of several feet and may have covered the insulator with a protective hood, although the evidence on this point is not clear. He removed his rubber gloves and, after tying

the first of the two new lines to the insulator, shifted his position for access to the other side of the crossarm and to the second of the new power lines. He was in the act of tying the second line to its insulator when he was injured by coming in contact with an electrical conductor.

McLain testified that while he was in contact with the second of the new lines it suddenly became energized and caused his injury. He claimed that his right arm was over the wire. His entire case was based upon the theory that the switch attached to the pole on Highway No. 1 controlled the flow of electric current into the lines on which he was working; that Carolina Power was, at all times before and during the period of the accident, in exclusive control of that switch; that the switch should have been kept in an open position by means of a padlock to prevent the flow of electricity into the wires, but that at the time of this construction the switch was negligently held in an open position only by the use of a loosely wound wire; that the switch was found to have been in a closed position shortly after the accident, thus having caused the energization of the lines upon which he was working; that by virtue of its control of the switch, only Carolina Power could have closed it, or, alternatively, some third person could have closed the switch and energized the lines due to Carolina Power's failure to secure it in an open position by means of a padlock.

McLain and his counsel were obviously under the mistaken impression that, from the switch pole on Highway No. 1, there was only a single energized line extending along the highway to Main Street, thence along Main Street to Chestnut Street and from Chestnut Street along Blackman Street to the gin. In fact, McLain testified that on the day before the accident, he had observed a single "jumper wire" which bypassed the switch and kept the single line energized. Thus, he proceeds upon a false premise since the evidence disclosed that from the switch, and connected therewith,

there were in existence two energized lines extending all the way to the intersection of Chestnut and Blackman Streets and that the project called for the installation of a third and single line from the switch to that intersection, and two new lines from that point to the cotton gin. There was no testimony by any other witness as to the jumper wire on the switch and all other witnesses agreed that the switch during the new construction was in a closed or contact position in order to provide uninterrupted service, and that the two lines extending from the switch to the intersection of Chestnut and Blackman Streets and the single line from that point to the gin were thus energized.

There was uncontroverted testimony that the two new power lines on which McLain was working at pole No. 116 were grounded to Carolina Power's neutral system at the Blackman and Chestnut Streets intersection and that, being so grounded, could not possibly be energized from that point forward to pole No. 116 by defendant's power sources. There was uncontroverted direct testimony that manipulation of the switch could in no way have effected a flow of Carolina Power's electric current into the two new power lines at the place were McLain was working. Negligence in respect to the control or operation of this switch, and the failure to keep it locked in one position or the other, could have had no possible bearing upon the unfortunate accident. There was nothing Carolina Power could have done to energize either of the two new power lines being installed by Sumter and Sumter was in full and complete control of the construction and installation project. Two of the witnesses who testified that the two new lines from the intersection of Chestnut and Blackman Streets were totally disconnected from a source of electric current and could not have been energized by any manipulation of the switch heretofore mentioned were members of Sumter's work crew and fellow employees of McLain. The other witnesses who so testified were employees of Carolina Power and were thoroughly familiar with the existing electrical distribution system and the effect of the operation of the switch. McLain did not produce any testimony to contradict these witnesses. In fact, his own testimony discloses that he knew that these two new wires on which he was working were to be connected only when the installation in their permanent position was completed.

■■ Upon a motion by the defendant for a directed verdict, the evidence and all reasonable inferences arising therefrom must be considered in the light most favorable to the plaintiff. This rule is so well settled that we need cite no authority to support it. But McLain's case is based on nothing more than speculation and conjecture. He suggests that he was injured because of the unauthorized and negligent energizing of one of the two new power lines which were to have remained unenergized until the completion of the job. He theorizes that these lines were energized by means of the negligent operation of the switch but there is no evidence in the record that electric current was turned into the alleged offending wire through this switch by Carolina Power or through the manipulation of the switch by any other person. He testified that the accident *could* have happened in this way but there is no evidence, either direct or circumstantial, that it *did*. Indeed, the uncontradicted evidence is to the contrary since the new wires on which he was working had not been connected to the system. That this switch was in Carolina Power's exclusive control does not create an inference or presumption of negligence on the part of Carolina Power in its care, control and operation thereof. It is unquestioned that the doctrine of *res ipsa loquitur* is not accepted in South Carolina. Perry v. Carolina Theatre, 1936, 180 S.C. 130, 185 S.E. 184; Hunter v. Dixie Home Stores, 1957, 232 S.C. 139, 101 S.E.2d 262; Weston v. Hillyer, 1931, 160 S.C. 541, 159 S.E. 390.

■ The only person working upon these new lines at or in the near vicinity

of pole No. 116 was McLain himself. That he was injured by a flow of electric current through an energized wire on pole No. 116 cannot be questioned. If it be true, as he claims, that he had his arm over the new wire and that it suddenly became energized, it is possible that such energization might have been caused by one of the construction crew. He was working in close proximity to wires which he knew to be hot and the evidence does not clearly disclose the manner in which the accident occurred. For this very reason the jury should not have been permitted to guess. We can only determine that it is clear the accident could not have been the result of electric current flowing into the new power lines from a source controlled by Carolina Power at the switch or at any point between the switch and the intersection of Blackman and Chestnut Streets. There is simply no evidence of actionable negligence on the part of Carolina Power.

Affirmed.