Arvil M. **ASHLEY**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 22839.

United States Court of Appeals Ninth Circuit.

July 7, 1969.

James C. Carruth (argued) of Miller, Pitt & Feldman, Tucson, Ariz., for appellant.

Alan S. Rosenthal (argued), Edwin L. Weisl, Jr., Asst. Atty. Gen., Patricia S. Baptiste, Atty., Dept. of Justice, Washington, D. C., Edward E. Davis, U. S. Atty., Phoenix, Ariz., for appellee.

Before ELY and CARTER, Circuit Judges, and POWELL, District Judge.*

ELY, Circuit Judge:

■ Ashley was the plaintiff below, having instituted a suit under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680. The basis of his claim was an alleged act of medical malpractice claimed to have been committed by a government physician on September 6, 1963. The suit was filed nearly four years later, on July 18, 1967, and the District Court granted the Government's motion for summary judgment. We affirm.

The District Court grounded its ruling upon that portion of 28 U.S.C. § 2401(b) which provided, at the time of the alleged malpractice, "A tort claim against the United States shall be forever barred unless action is begun within two years after such claim accrues * * *." Ashley attempts to circumvent the bar by arguing that while he actually became aware, on or about September 6, 1963, that he had been injured, he did not learn that the injury was "permanent" until a time less than two years before he filed his suit. He urges that since this is true and that since he had been continuously undergoing treatment for the injury from government physicians throughout the period, his claim did not "accrue" until he learned the extent of the injury.

Ashley is a disabled veteran. Suffering from pulmonary emphysema, he was granted disability retirement from the Navy in 1960. In April of 1963, he was rated totally disabled because of his disease. He was eligible to receive treatment at medical facilities of the Veterans Administration. In early 1963, he had been examined at a Veterans Hospital in Otten, North Carolina, where, according to Ashley, a doctor had there warned him that the drawing of blood from his arm by use of a needle could result in nerve injury. Afterward, Ashley returned to Arizona, where, for his emphysema, he was generally treated by a private physician who was authorized to administer treatment for the Government and was paid by the Veterans Administration for such services. On September 6, 1963, however, Ashley went to the Veterans Hospital in Tucson, Arizona, for certain tests. One of these required the taking of blood for analysis of its oxygen content. A government physician made three unsuccessful attempts to take arterial blood from Ash-

* Honorable Charles L. Powell, United States District Judge, District of Washington, sitting by designation.

ley's forearm with a needle. In these attempts, a nerve was contacted, and a blood clot developed. There was pain and also swelling, extending downward on the forearm to the thumb. On the following day, Ashley consulted his private, government paid, physician. This doctor advised him to return to the Veterans Hospital where he had suffered his injury the day before. There he was told that a nerve had been hit and was referred to a consulting physician in Tucson. This physician, who was also paid by the Veterans Administration, prescribed whirlpool baths for the swollen arm. This treatment was thereafter given regularly at the Veterans Hospital in Tucson, and Ashley also there received electric shock therapy during the same period. In his deposition, Ashley testified that he was told by "doctors at the V.A. hospital," during the time of his treatment for the nerve injury, that his was "a rare complication" and that "there's never been a permanent damage known yet."

In September, 1966, Ashley was examined at a Veterans Hospital in Los Angeles, California. He claims that he subsequently received a letter from "them" and that the letter's contents caused him then to believe that his injury would be permanent. Ashley's suit followed.

In fixing the time limitation in question, Congress provided for no exception. Institution of suit within the two-year period is a jurisdictional requirement. Mann v. United States, 399 F.2d 672 (9th Cir. 1968). The limitation period is not tolled during the time of a claimant's minority. Brown v. United States, 353 F.2d 578 (9th Cir. 1965); Pittman v. United States, 341 F.2d 739 (9th Cir.), cert. denied 382 U. S. 941, 86 S.Ct. 394, 15 L.Ed.2d 351 (1965). It is not tolled in favor of a minor Indian who is a ward of the Government. Mann v. United States, *supra*. Until the statute was amended in 1966, the filing of a claim for administrative disposition did not interrupt the running of the two-year limitation period. Pow-

ers v. United States, 390 F.2d 602 (9th Cir. 1968).

From the decisions of our court, it can be seen that we have believed that if exceptions are to be engrafted upon the statute's strict limitation provision, such exceptions should be established by Congress, which surrendered the Country's sovereign immunity as to certain tort claims, and not by the courts.

Ashley argues that we are given leeway because we are permitted to interpret the meaning of "accrues," as the word appears in the statute. To a very limited degree, we have in a sense enlarged the limitation period by previously holding that in medical malpractice actions brought under the Federal Tort Claims Act, the claim "accrues against the Government when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged malpractice." Hungerford v. United States, 307 F.2d 99, 102 (9th Cir. 1962); *see also* Brown v. United States, *supra*; Quinton v. United States, 304 F.2d 234 (5th Cir. 1962). This principle does not benefit Ashley. He knew of the *acts* constituting the alleged malpractice when they were done on September 6, 1963, and he also knew, within a day or two thereafter if not at the same time, that he had been injured and that it had not been expected that the injurious consequences would result from the test. In Brown v. United States, *supra*, government physicians administered oxygen to a newborn infant to save its life. The lifesaving treatment resulted in blindness. When the child was released from the hospital, its parents were told that the oxygen's use would result in impaired vision, and a year later government physicians told them that their child was totally blind and would likely remain so. Notwithstanding, suit against the Government was not filed in behalf of the child by her father, the guardian ad litem, until approximately seven years and four months after the alleged malpractice had occurred. We affirmed the District Court's judgment that the suit was

barred for lapse of time. We wrote, "Thus, the trial court properly concluded that to the parents there came knowledge of facts sufficient to alert a reasonable person that there may have been negligence related to the grievance for which the complaint was subsequently made." 353 F.2d at 580. The temptation to circumvent the prescribed time limitation is more easily resisted here than it would have been in the tragic circumstances of *Brown*. The injured person in *Brown* was a baby. Ashley is an adult. He was more immediately knowledgeable that acts which possibly constituted malpractice had been committed than were the parents in *Brown*.

▮ We reject the argument that since Ashley's relationship as the patient of government physicians never terminated, the limitation period did not commence to run. A few jurisdictions have adopted this principle in cases not involving the Federal Tort Claims Act. *See* Annot., 80 A.L.R.2d 368 § 6 (1961 and later supplements). In dictum, the Second Circuit has suggested that it might also be appropriate for application in some medical malpractice suits instituted under the federal act. Kossick v. United States, 330 F.2d 933, 936 (2d Cir.), cert. denied, 379 U.S. 837, 85 S.Ct. 73, 13 L.Ed.2d 44 (1964). We disagree. The principle may have originated because it was thought that a private physician, knowing of his actionable mistake, might be able to conceal it from his patient or continuously to lull the patient into failing to institute suit within the ordinarily permissible time period. To apply such a rationale in this case would be unrealistically to imagine that a government physician in a Veterans hospital would be able to conspire successfully with all other government physicians and medical attendants who direct their attention to patients such as Ashley.

In Owens v. White, 380 F.2d 310 (9th Cir. 1967), as we undertook to apply the law of Idaho, we held that a medical malpractice action was barred by a two-year limitations statute, even though the mistaken diagnosis upon which the suit was based was alleged not to have been discovered until within two years of the filing of the action. We wrote that "essential justice requires prevention of the imposition of liability upon physicians who, because of the passage of time, have become disempowered to present meritorious defenses." 380 F.2d at 315. The comment is equally appropriate, if not more so, in the consideration of the interests of the Government in cases like the one before us. It is not unlikely that the Government's medical personnel is often subject to transfer and that its employment of individual physicians may be more difficult and less permanent than that of workmen to whom nongovernment service may be less attractive. This is only one consideration leading us to believe that those like Ashley should not be encouraged to permit their claims to become so very stale.

In this case, the Government's physicians did not conceal the fact of injury. Ashley was promptly advised that an unintended accident had occurred. During oral argument in our court, his attorney conceded that there was no contention that Ashley was negligently treated by any government agent after September 6, 1963. To hold that one who knows that an injurious tort has been committed against him by the Government may delay the filing of his suit until the time, however long, when he becomes knowledgeable as to the precise extent of the damage resulting from the tort would impose intolerable burdens upon the Government and would, in effect, frustrate the expressed will of the Congress.

· Affirmed.