Leslie E. PORTIS, an infant, who sues by her father and next friend, James R. Portis, Appellant,

v.

UNITED STATES of America, Appellee.

No. 73–1160.

United States Court of Appeals, Fourth Circuit.

Argued June 7, 1973.

Decided Aug. 29, 1973.

E. Ralph James, Jr., and L. Eldon James, Hampton, Va. (James, Richardson & James, Hampton, Va., on brief), for appellant.

Roger T. Williams, Asst. U. S. Atty. (Brian P. Gettings, U. S. Atty., on brief), for appellee.

Before WINTER, CRAVEN, and FIELD, Circuit Judges.

CRAVEN, Circuit Judge:

This is an appeal from dismissal of a complaint under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). Leslie Portis, age nine, is the real plaintiff, and is now almost totally deaf allegedly as the result of medical malpractice in an Air Force hospital in 1963. The United States concedes the malpractice, and yet, incredibly, interposes the bar of the

two-year statute of limitations.[1] Reluctantly, the district judge applied the statute, 28 U.S.C. § 2401(b),[2] and dismissed.[3] We think the statute of limitations as applied to the hearing loss began to run in 1969 when, for the first time, a doctor ascribed Leslie's deafness to the 1963 malpractice, and that accordingly, the suit was timely begun, and we reverse.

In October 1963, Leslie, then approximately 15 months old, was admitted to the United States Air Force Hospital, Maxwell Air Force Base, Alabama, for corrective surgery of a bowel disorder. In preparation for this operation, a staff physician prescribed one gram of Neomycin to be given to Leslie every six hours. The drug was to be administered orally, but tragically, an unidentified government nurse administered seven doses of it hypodermically. This negligent muscular injection of Neomycin immediately caused acute kidney poisoning nearly resulting in Leslie's death. The renal toxicity was soon corrected and Leslie was discharged from the hospital in November 1963—apparently none the worse for her near-mortal experience.

A possible side effect of intramuscularly administered Neomycin is damage to the auditory (eighth cranial) nerve. Hearing impairment may result from destruction of small hair cells in the inner ear. Leslie's hearing was checked by a qualified audiologist before she left the hospital, and while no hearing damage was then evident, Mrs. Portis was advised to have Leslie's hearing reevaluated at age three. Over the next few years, Leslie was frequently ill with ear, throat, and respiratory infections, including pneumonia and tonsillitis. As a result, a tonsillectomy and adnoidectomy were performed, and tubes were inserted to drain fluid which had accumulated in her ears.

Amid these various ailments, Leslie's hearing began to deteriorate, a fact first suspected by her mother in 1964 and confirmed by the age-three hearing tests. In an attempt to improve her hearing, Leslie underwent extensive examination and treating during the next five years. During this entire time, however, none of the physicians who examined and treated Leslie (there were about seven) diagnosed the cause of hearing loss. Mrs. Portis was told that deafness could have been caused by ear infections, high fever, or the Neomycin injections. It was not until 1969 that a doctor finally diagnosed Leslie's problem as a profound neurosensory hearing loss related to Neomycin toxicity. Colonel Portis brought this action for his daughter in 1970.

[1]. The reasons advanced for the enactment of statutes of "repose" are these: a "stale" claim may be more readily asserted fraudulently and the passage of time hampers defense, e. g., records may have been lost, witnesses may have died. That there is no reason to interpose a plea in bar against a just claim is reflected in the rule in some jurisdictions that the pleading of a statute of limitations is discretionary even for fiduciaries. E. g., 31 Am.Jur.2d Executors & Administrators § 738 (1967).

[2]. 28 U.S.C. § 2401(b) (1966) provides in part:

A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues . . . .

This is the section as amended in 1966. The revision does not affect this case, however, since the amendment did not alter the substance of the two-year limitation.

[3]. Displaying both modesty and a fine sense of justice, the district judge put into his memorandum of decision the following:

While we have thus made the decision which we believe the state of present law requires under the facts of this case, and, indeed, there is little factual conflict here involved, we are frank to say we are not satisfied with the recorded decisions and would welcome change.

. . . . .

The problem is a knotty one, not here really solved, but we would welcome the intelligence of the appellate Court.

He proceeded to persuasively criticize Pittman v. United States, 341 F.2d 739 (9th Cir. 1965), but apparently felt bound by it. We think it distinguishable, but if not, we respectfully decline to follow it.

▇ In considering whether to apply the statute of limitations,[4] the district judge first found that in October 1963, Mrs. Portis knew of the wrongful injections, and knew of the efforts being made to correct renal failure caused by the intramuscular injections of Neomycin. The court then concluded, and we think correctly so, that the statute of limitations began to run in 1963 as to any possible cause of action based upon the renal poisoning.[5]

The district judge also found that Mrs. Portis knew in November 1963 that there was a "distinct possibility" of future hearing loss as a result of the malpractice.[6] Applying Ashley v. United States, 413 F.2d 490 (9th Cir. 1969), to this finding, the court then concluded that the resulting hearing loss could not be treated as a separate cause of action so as to start the statute of limitations running anew in 1969 (at time of first diagnosis), but was merely another manifestation of the same negligent 1963 act which caused renal failure, and that the suit was therefore barred because it accrued in 1963.

Although we accept this finding as not clearly erroneous, for purposes of decision, we do not believe that it mandates the result reached below.

▇ In concluding that Colonel Portis's suit for the negligent injury of his daughter resulting in deafness was barred by the statute of limitations, the district judge relied heavily upon *Ashley, supra.* We think *Ashley* distinguishable and his reliance misplaced. In *Ashley* the plaintiff attempted to avoid the two-year limitation by asserting that although he was aware in 1963 that malpractice had occurred and had injured him, he did not realize until 1967 the full extent of his injury. The plaintiff in *Ashley* suffered a nerve injury when doctors attempted to take a blood sample by insertion of a needle. He knew of the nerve injury at the time of occurrence, and his belated claim was for nerve injury. The only excuse offered for delay in instituting suit was his assertion that he did not know the injury would be a permanent one. We agree with the Ninth Circuit that one who knows that an injurious tort has been committed against him may not delay the filing of his suit until the time, however long, when *he* learns the precise extent of the damage resulting from the tort. That is all that *Ashley* holds, and it has long been settled that the running of a statute of limitations does not await determination of the full extent of injury.

Quinton v. United States, 304 F.2d 234, 240 (5th Cir. 1962). *See, e. g.,* Toal v. United States, 438 F.2d 222, 224–225 (2d Cir. 1971) ; Ashley v. United States, 413 F.2d 490, 492 (9th Cir. 1969).

4. It is now well settled that federal law determines when a claim accrues within the meaning of 28 U.S.C. § 2401(b), Toal v. United States, 438 F.2d 222, 224 n. 3 (2d Cir. 1971).

5. Prior to 1962, there was a divergence of opinion among the federal courts as to when this statute began to run. *See* Tessier v. United States, 269 F.2d 305 (1st Cir. 1959). Chief Judge Tuttle of the Fifth Circuit, in rejecting the rather harsh rule that a cause of action for malpractice accrues when the negligent acts occur even though the injured patient is unaware of his plight, stated what has now become the standard interpretation of § 2401(b) :

> [A] claim for malpractice accrues against the Government when the claimant discovered, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged malpractice.

6. Although it is not entirely clear from the memorandum of decision, this finding is apparently based upon the district judge's rejection of Mrs. Portis's testimony that she was never advised by Air Force doctors that there could be damage to the auditory nerve as the result of muscularly administered Neomycin. The district judge reasoned, erroneously, we think, that Mrs. Portis must have known and understood that a hearing injury could result because she was a graduate nurse and such a possible effect to the eighth cranial nerve is "a medical hornbook diagnosis." Yet, significantly, there is no finding that any medical doctor ever made such a diagnosis until 1969.

In contrast, we think the facts of this case constitute an exception to the general rule that causes of action may not be split. The record and the findings of fact clearly reveal that the unknown factor that delayed instituting this lawsuit was not the nature and extent of Leslie's injury (loss of hearing), but rather what caused it.[7] Colonel Portis could not hope to recover compensation for his daughter's deafness unless the 1963 malpractice was the proximate cause, or one of the proximate causes, of Leslie's loss of hearing. Even if the colonel knew that there was a "distinct possibility" of a causal relationship, knowledge and testimony to that effect is scarcely enough to go to the finder of fact on the question of causation. What is important here is that no one, neither layman nor doctor, diagnosed the hearing difficulty as being caused, or even probably caused, by the 1963 malpractice until the year 1969.

We accordingly hold that Leslie Portis's cause of action for malpractice resulting in deafness did not accrue until 1969. To hold otherwise, we believe, would be contrary to the rationale of § 2401(b).

"We do not think the humane legislative plan intended such consequences to attach to blameless ignorance. Nor do we think those consequences can be reconciled with the traditional purposes of statutes of limitations, which conventionally require the assertion of claims within a specified period of time after notice of the invasion of legal rights." Urie v. Thompson, 337 U.S. 163, 170, 69 S.Ct. 1018, 1025, 93 L.Ed. 1282 (1949).

As we stated in Young v. Clinchfield R. R., 288 F.2d 499, 503 (4th Cir. 1961):

[W]hen the nature of the injury is such that it does not manifest itself immediately, the determination of when the cause of action accrued does not depend on when the injury was inflicted. To the contrary, the cause of action accrues only when the plaintiff has reason to know he has been injured. Generally this will be when his condition is diagnosed . . . .

While *Young* involved the situation where the *injury* was not immediately detectable, we believe the same rationale is applicable where, as here, the *cause* of the injury was neither known nor reasonably detectable.

Reversed.

---

7. Prosser lists as an essential element of a cause of action

A reasonably close causal connection between the conduct and the resulting injury. This is what is commonly known as "legal cause," or "proximate cause."

W. Prosser, Law of Torts 146 (3d ed. 1964). *E. g.,* 2 F. Harper & F. James, Law of Torts § 20.4 (1956).

The court in Ashley v. United States, 413 F.2d 490 (9th Cir. 1969), fully realized the requirement of proximate cause and damage when it noted that the plaintiff "knew of the *acts* constituting the alleged malpractice when they were done on September 6, 1963, and he also knew . . . that he had been injured" as a result of those acts. [Original emphasis]. Ashley v. United States, 413 F.2d 490, 492 (9th Cir. 1969). Colonel Portis, on the other hand, may have reasonably thought his daughter had *not* been injured—at least not appreciably and not beyond the cost of hospitalization and medical care provided by the government.