**Clifford Roy BRIDGFORD, Appellee,**

v.

**UNITED STATES of America, Appellant.**

**No. 76–1538.**

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 10, 1976.
Decided Feb. 28, 1977.

Walter A. Oleniewski, Atty., Civ. Div., Dept. of Justice, Washington, D. C. (Rex E. Lee, Asst. Atty. Gen., Washington, D. C., Jervis S. Finney, U. S. Atty., Baltimore, Md. and Ronald R. Glancz, Atty., Civ. Div., Dept. of Justice, Washington, D. C., on brief), for appellant.

Laurence T. Scott, Washington, D. C. (Leo A. Roth, Jr., Washington, D. C., on brief), for appellee.

Before WINTER and CRAVEN, Circuit Judges, and FIELD, Senior Circuit Judge:

CRAVEN, Circuit Judge:

In this medical malpractice suit brought under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), the Government appeals from a $65,000 judgment entered against it. It contends that the suit was barred by the statute of limitations, 28 U.S.C. § 2401(b),[1] and that the district court's finding of negligence on the part of the government employee was clearly erroneous. Rejecting both of these contentions, we affirm.

I.

Bridgford, the dependent of a retired military officer, developed varicose veins in his left leg when he was 19 years old. Doctors at both Walter Reed Army Medical Center and Bethesda Naval Hospital [Bethesda] advised him to undergo a vein stripping operation to alleviate this condition. He was told that he would be incapacitated for

---

1. A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

28 U.S.C. § 2401(b), *as amended* July 18, 1966.

no more than two weeks following the surgery.

On June 9, 1964, Bridgford underwent the operation at Bethesda. The surgical procedure consisted of tying off and severing each varicose vein which was to be removed. Then a stripping rod was inserted and run through the vein, and it was pulled from the patient's leg. This operation was performed on Bridgford by Dr. James Ryskamp, Jr., a fourth-year surgical resident, and Dr. Nicholas Raffaelly, a first-year resident.

During the operation Dr. Raffaelly, who was working on Bridgford's upper leg, noticed that it had become swollen and that blood was not exiting from it. He called over a vascular surgeon, Dr. James McClenathan, to examine Bridgford. Dr. McClenathan discovered that a major leg vein, the common femoral, had been severed. Although this vein is normally much further below the surface of the leg than the superficial ones that are stripped, Dr. Raffaelly had apparently mistaken it for one which was to be removed. To remedy the error, Dr. McClenathan immediately joined the remaining portion of the severed femoral vein to an intact portion of the greater saphenous vein. This surgical procedure, known as an anastomosis, restored the drainage of blood from Bridgford's leg. Drs. Ryskamp and Raffaelly then completed the vein stripping operation.

Following the operation Dr. Ryskamp explained to Bridgford and his mother that a vein had been mistakenly severed and that it had been sewn back together. He assured them that the blood was flowing properly through the vein. When Bridgford experienced greater postoperative pain and swelling than he had anticipated, he was told by the doctors that it was probably due to some nerve damage caused by the stripping of the veins and that he was just healing at a slower rate than most people.

Bridgford was discharged from Bethesda on June 24, 1964, but about a week later was readmitted because he had not been making satisfactory progress at home. During this hospital stay doctors told him that the continued pain he was experiencing might be due to emotional problems. He was reassured, however, that he would get better.

During the months following the operation, Bridgford continued to experience pain and difficulty in walking. By 1967 his condition had improved, but he still had swelling and discomfort. His condition remained about the same until August 1969, at which time he noticed a vein in his left buttock getting more enlarged and painful. He consulted a private physician, Dr. James Boland, who recommended that he have a venogram performed. He did so in August 1970. After examining the venogram, Dr. Boland concluded that the femoral vein, which had been severed during the vein stripping operation, had become blocked, probably within a few days or weeks after the anastomosis. Dr. Boland and another doctor who was consulted, Dr. Joseph Schanno, both agreed that this blockage could not be corrected by surgery and that the only possible treatment was the continued use of supportive stockings. As a result of these doctors' findings, Bridgford filed an administrative claim with the Navy on July 17, 1971. Following the Navy's failure to act on the claim, the present suit was filed on November 20, 1972.

The district court noted that there was no contention that Dr. McClenathan had done anything wrong in performing the anastomosis. In fact, plaintiff's experts testified that blockage was a common result of such a procedure. Rather the central issue was whether the severance of the common femoral vein which had necessitated the anastomosis was due to negligence on the part of Dr. Raffaelly. The court concluded that Bridgford had established by his experts that Dr. Raffaelly had breached the applicable standard of care in two respects: (1) he failed adequately to locate and identify the relevant anatomical structures before ligating and dividing Bridgford's veins, and (2) he dissected too deeply. The district court also concluded that the suit was not barred by the statute of limitations because

any delay in filing the suit was the result of Bridgford's "blameless ignorance."

The phrase "blameless ignorance" originated with the Supreme Court's decision in *Urie v. Thompson,* 337 U.S. 163, 170, 69 S.Ct. 1018, 1025, 93 L.Ed. 1282 (1949). In that case involving the Federal Employers' Liability Act, the Court rejected a harsh construction of the statute of limitations, stating:

> We do not think the humane legislative plan intended such consequences to attach to blameless ignorance. Nor do we think those consequences can be reconciled with the traditional purposes of statutes of limitations, which conventionally require the assertion of claims within a specified period of time after notice of the invasion of legal rights.

## II.

■ The statute of limitations governing a tort action brought against the United States provides that "[it] shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues . . .." 28 U.S.C. § 2401(b).[2] The point at which the claim accrues is governed by federal law. *Portis v. United States,* 483 F.2d 670, 672 n.4 (4th Cir. 1973). In the case of a malpractice claim against the Government, the often stated rule of accrual is that it accrues "when the claimant discovered, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged malpractice." *Quinton v. United States,* 304 F.2d 234, 240 (5th Cir. 1962). Although this formula for accrual was intended to prevent the harsh result of the statute's running before the patient was even aware that any negligent acts had been committed, if applied literally as the Government here urges, it can result in the equally harsh result of the statute's running

before the patient realizes that the negligent acts on the part of the government employee caused him harm.

In *Portis, supra,* this court recognized the possible harshness of the rule and modified its application. There parents of the minor plaintiff learned in October 1963 that an Air Force nurse had erroneously administered Neomycin hypodermically rather than orally as instructed. They did not learn, however, until 1969 that this earlier negligence on the part of the government employee had caused their daughter's loss of hearing. Rather than holding that the statute of limitations began to run in 1963 when they learned of the acts constituting the alleged negligence—as a literal application of the accrual rule would require—we held that "[the] cause of action for malpractice resulting in deafness did not accrue until 1969." 483 F.2d at 673. The basis of our decision was that until 1969 the plaintiff and her parents were blamelessly ignorant of the fact that the improper administration of Neomycin was the proximate cause of plaintiff's deafness. It therefore would have been unreasonable to require them to bring suit earlier.

■ Our holding in *Portis* is consistent with the basic principle of tort law that " . . . a cause of action founded upon negligence, from which liability will follow, requires more than conduct." W. Prosser, *Handbook of the Law of Torts,* 146 (3d ed. 1964). Not only must a plaintiff establish that the government employee had a duty towards him which he breached, he must also establish that this conduct was the proximate cause of an actual loss or damage suffered by him. The statute of limitations should not operate to foreclose suit before the potential claimant has a reasonable basis for believing that he has a possible cause of action against the Government. Therefore, until a claimant has had a rea-

---

**2.** Prior to the 1966 amendment, an injured person had to file his lawsuit within two years of the claim's accrual, unless it did not exceed $2,500. 28 U.S.C. § 2401(b) (1965). The statute was amended to encourage out-of-court settlements between the claimant and the agency and to prevent the institution of unnecessary lawsuits. Since we conclude that plaintiff's cause of action did not accrue until after the effective date of the amendment (January 18, 1967), the significant event is the filing of the claim rather than the bringing of the lawsuit.

sonable opportunity to discover *all* of the essential elements of a possible cause of action—duty, breach, causation, damages—his claim against the Government does not accrue.[3]

■ The Government here contends that Bridgford was made aware in 1964 that he had a possible cause of action against the Government, even if for no more than nominal damages, and that therefore his claim accrued at that time. In considering this contention, we first note that "[n]ominal damages, to vindicate a technical right, cannot be recovered in a negligence action, where no actual loss has occurred. The threat of future harm, not yet realized, is not enough." W. Prosser, *supra*, at 146–47. It is questionable whether Bridgford with the exercise of reasonable diligence could have discovered in 1964 that he had incurred an actual loss as a result of the severance of his femoral vein. Certainly he knew that the vein had been severed, but he was not made aware of any adverse consequences of that mistake. In fact, he was told that the vein had been repaired and that blood was draining properly from his leg. Whatever unexpected pain and suffering he experienced was said by the doctors to have resulted from nerve damage or emotional problems. And his extended period of recuperation was attributed to the fact that he was a slow healer.

But even if it could be shown that Bridgford was aware of some actual loss immediately following the operation, we do not think that 28 U.S.C. § 2401(b) required him immediately to file a claim for those nominal damages or be forever barred from seeking relief. In *Portis* we found that fact situation to constitute "an exception to the general rule that causes of action may not

be split." 483 F.2d at 673. There plaintiff's parents were immediately informed of the existence of renal poisoning resulting from the act of malpractice. However, because that damage was soon corrected by the doctors, we noted that "Colonel Portis . . . may have reasonably thought his daughter had *not* been injured—at least not appreciably and not beyond the cost of hospitalization and medical care provided by the government." *Id.* n.7.

Just as in *Portis*, where the claimants' early knowledge of inappreciable damages did not preclude the later suit for substantial damages, we here conclude that Bridgford's suit is not barred by his possible knowledge in 1964 of some nominal loss resulting from the severance of his femoral vein. Allowing the plaintiff, in effect, to split his cause of action between an earlier possible suit for negligible damages and this suit for substantial damages is not at odds with general principles of procedure.

Usually in cases where the plaintiff, because of unavoidable ignorance of the full extent of his injuries or of particular items of damage or by reason of mistake, unless due to negligence, fails to include his full claim in the first suit, the rule against splitting will not be applied and a second suit may be maintained for the balance of his claim.

1 Am.Jur.2d *Actions* § 130 (1962) (footnotes omitted).

The Government further contends that even if the claim did not accrue in 1964 it was unreasonable for Bridgford to have failed to discover the blockage of his femoral vein before 1970. The Sixth Circuit responded to a similar argument in *Jordan v. United States*, 503 F.2d 620, 624 (6th Cir. 1974), as follows:

---

**3.** Professor Prosser explains why:
> Since the action for negligence developed chiefly out of the old form of action on the case, it retained the rule of that action, that proof of damage was an essential part of plaintiff's case. . . .
>
> . . . . .
>
> It follows that the statute of limitations does not begin to run against a negligence

> action until some damage has occurred. . . . Quite recently there have been a wave of decisions meeting the issue head-on, and holding that the statute will no longer be construed as intended to run until the plaintiff has in fact discovered that he has suffered injury or by the exercise of reasonable diligence should have discovered it.

W. Prosser, *supra*, at 146–48 (citing cases).

[I]t is undisputed that shortly after discovering the symptoms appellant investigated their cause and received what he considered to be a credible explanation. In addition, the record reveals no evidence which indicates that appellant ever witnessed anything prior to June 7, 1971, which should have led him to believe that the explanation he had received was not totally accurate . . .. In this situation we do not believe that it can be said that appellant failed to exercise reasonable diligence.

The district court reached a similar conclusion here, and we agree, with one modification. Because Dr. Boland advised Bridgford to have a venogram performed in August 1969, he could have learned of the blockage at that time. However, he waited almost a year to have it done. But even accepting August 1969 as the date of accrual, his claim was still timely, as it was filed with the Navy within the required two years. We therefore agree with the district court that plaintiff's suit was not barred by the statute of limitations.

■ As for the Government's other argument on appeal, that the district court's finding of negligence was clearly erroneous, we disagree. The court had before it the conflicting testimony of the opposing experts. We cannot say that he was clearly erroneous in choosing to accept the testimony of Bridgford's experts rather than the Government's doctors.

Accordingly, the judgment of the district court is

AFFIRMED.