**William S. TODD, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 81–0680–1.**

United States District Court,
D. South Carolina,
Charleston Division.

Sept. 14, 1983.

Robert B. Wallace, and Paul E. Tinkler, Charleston, S.C., and George B. Bishop, Moncks Corner, S.C., for plaintiff.

Heidi M. Solomon Asst. U.S. Atty., Charleston, S.C., and Samuel C. Waters, Veterans Admin., Columbia, S.C., for defendant.

## ORDER

HAWKINS, District Judge.

Brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.,* this malpractice action was tried before the court without a jury on June 28–30, 1983. The plaintiff, William S. Todd, alleges medical malpractice occurred during a surgical procedure performed on him at the Charleston Veterans Administration Hospital on October 1, 1975.

The court, having heard all the evidence and having reviewed the briefs of counsel filed in this case, and having fully considered the applicable law, makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Mr. Todd was born March 8, 1924. By virtue of military service, he was entitled to receive medical care from the Veterans Administration.

2. Mr. Todd worked as an electrician after his naval service until his condition forced him to seek medical attention in 1975. He had begun to experience weakness in his legs in the early part of 1975 and the weakness had progressed to a point where Mr. Todd's acquaintances commented to him that he looked like he was drunk when he walked. The weakness in Mr. Todd's legs had begun to affect his work as an electrician, when in the summer of 1975, it became difficult for him to climb a ladder. He was also suffering from an impairment of the fine movements of his fingers.

3. Mr. Todd was seen in the out-patient department of the Charleston VA Hospital (hospital) in September 1975 for difficulty in walking and balance problems. He was admitted to the hospital on September 15, 1975, where, after examinations, diagnostic tests, and consultations by the neurology and neurosurgery departments, his condition was diagnosed as cervical spondylosis.

4. Cervical spondylosis is defined as abnormal immobility and fixation of the cervical spine due to pathological changes in the joint or its surrounding tissue. Cervical spondylosis affects the spinal cord and the nerve roots because overgrowths of boney material encroach on and compress the spinal cord and nerve roots.

5. X-rays and myelograms taken of Mr. Todd's cervical spine in September, 1975, at the hospital revealed that the pathologic changes that had occurred in his cervical spine were prominent boney formations at all levels with marked cross-bar boney formations at the C4–5 and C6–7 disc interspaces, confirming that Mr. Todd's spinal cord and nerve roots were being severely compressed by these boney formations.

6. The expert witnesses agreed that on a scale of one-to-ten on encroachment of

the spinal cord, Mr. Todd would have been an eight prior to surgery, and that surgical intervention, in the nature of a decompressive cervical laminectomy at levels C3–C7, was the most effective form of treatment for a patient with cervical spondylosis to the extent as had the plaintiff. The purpose of the removal of these levels of lamina was to halt further compression of the plaintiff's spinal cord and to prevent further deterioration of Mr. Todd's condition. Cervical spondylosis is a condition that progressively worsens after an eight to ten year period.

7. Although Mr. Todd signed a consent form on which the operative procedure was cursorily described without listing the risk involved, he testified that he did not understand the risk involved; that he was told by the attending neurosurgeon, Dr. Joseph Marzluff, a neurosurgical resident, during a twenty or thirty minute conversation that a laminectomy was a relatively minor procedure and that he would be back on the job within two or three weeks after surgery. He does not remember talking to the Chief of the Neurosurgery Department, Dr. Ludwig G. Kempe, who acted as first assistant during Mr. Todd's surgery, and there is no written record of such a conversation. He testified that he believed Dr. Marzluff was going to remove something that appeared like "a grain of rice" from his neck, and that this small object was causing the problem. Mr. Todd stated that he would not have undergone surgery had he known of its limited possible benefit and substantial risk. He testified that he was particularly afraid of paralysis since he knew a football player in his town who had been paralyzed due to a neck injury. Drs. Marzluff and Kempe testified that the surgical procedure—a decompressive cervical laminectomy, the purpose of the surgery—to stop further deterioration of the plaintiff's condition, and the inherent risks of the operation—a worsening of the patient's condition, complete paralysis or death, were fully explained to Mr. Todd. Although Dr. Kempe personally remembered explaining these factors to Mr. Todd, Dr. Marzluff could only testify that, while he does not remember the conversation, those factors are ones he would tell any patient with Mr. Todd's condition. Based on the above, this court finds that, while Drs. Marzluff and Kempe believe they fully informed Mr. Todd of the risks, Mr. Todd did not have a complete understanding of the risks involved at the time of surgery.

8. I find that without surgery Mr. Todd's condition would have progressively worsened. Although Mr. Todd was not made fully aware of the associated risks of the surgery, this court finds that a reasonable man in Mr. Todd's position would have consented to the operation even if he had been informed of possible adverse effects.

9. On October 1, 1975, a decompressive cervical laminectomy at the C3–C7 levels of the cervical spine was performed on Mr. Todd by Dr. Ludwig Kempe and Dr. Joseph Marzluff.

10. I find that intubation through the mouth on a patient such as Mr. Todd, when performed in a manner that avoids hyperextension of the neck, was in accordance with recognized, accepted medical procedure in 1975 as well as to date. Further, there is no evidence that hyperextension occurred. Mrs. Valeria York, the nurse anaesthetist who performed the intubation, and Dr. Kempe, both testified that Mr. Todd's neck was not hyperextended. Dr. Kempe testified that he was aware of Mrs. York's qualifications and skills; that in 1975 she did not need specially-written instructions, and that he would have orally reminded her to be careful, as was his habit, since he was present during the intubation. Based on the above facts, this court finds that the failure of the surgeons to issue a written warning to Mrs. York was not a breach of the proper standard of care.

11. The decompressive cervical laminectomy was performed in the following manner. Bone was exposed over the posterior aspect (back side) of the cervical spine. The spinous processes were removed. Then, beginning inferiorly (at the bottom lamina, here C7), a pair of rongeurs (which is an instrument for biting bone, eating

away a small fragment of bone at a time) was used to remove the laminae themselves (boney membranes) at levels C3 through C7 of the cervical spine. As the bone becomes smaller, and the spinal cord approached, smaller, more delicate rongeurs were used. The edge of the rongeurs was positioned in an oblique manner so that the bone and ligament overlying the back of the spinal cord were removed without pushing down on the dura (the outer membrane covering the spinal cord). Once the laminae had been removed, the surgeons noted that the dura, especially at the level of C5, 6 and 7 was still taut and non-pulsatile, signs that the spinal cord needed further decompression. Therefore, the dura was opened, without opening the arachnoid (the middle membrane, inside the dura, which covers the spinal cord). Dr. Marzluff noted "when this was done, the arachnoid bulged out, the dura retracted and the cord began to pulsate. After this had been completed, it was felt the patient received an adequate cervical decompression." See Operation Report, pp. 75–76 of the medical record. Gelfoam was placed over the dura's opening to allow the spinal cord the room it needed. The blood flow was electrocoagulated and the wound closed in layers.

12. At the time of surgery, all indications were that the patient's spinal cord had been successfully decompressed. There was no evidence whatsoever that the cord was damaged or traumatized in any way before or during surgery.

13. In all respects, the manner in which the decompressive laminectomy was performed was in accordance with accepted, recognized medical procedure.

14. The only testimony which challenged that the surgery was performed in all respects in accordance with accepted, recognized medical procedures, was that presented by the plaintiff's witness, Dr. Exum Walker. Dr. Walker speculated that any of the following could have caused the plaintiff's worsened condition from surgery: use of rongeurs, use of a periosteal elevator, and a neurosurgery resident's participation in the surgery. As evidence of improper care, he pointed to the blood lost by the patient, and the length of time it took the surgeons to perform this procedure. He could not testify with any degree of medical certainty that use of any of these instrumentalities caused the plaintiff's injuries. Furthermore, his testimony did not persuade this court that their use was a breach of recognized medical procedure.

The Government's expert testimony, supported by contemporaneous medical literature, showed that rongeurs and periosteal elevators were surgical instruments universally used in 1975 by the neurosurgical community for this type of surgery. While Dr. Walker advocated use of an air drill instead of rongeurs, it was clear that this was only his personal preference, and that use of rongeurs per se was no deviation from accepted medical procedure.

As to the issue of Dr. Marzluff's involvement in the surgery, Dr. Marzluff, at the time of this surgery, had completed a year of surgical residency and a year and four months of a neurosurgical residence.[1] He and Dr. Kempe performed the neurosurgery together; he was at all times properly supervised by Dr. Kempe.[2] As they both tes-

---

1. Dr. Joseph Marzluff is presently the Chief of the Neurosurgery Department of the Navy Regional Medical Center at Portsmouth, Virginia. As stated above, prior to the plaintiff's surgery, he had graduated from the Medical University of South Carolina (in 1973) and had completed a year's surgery residency at the Naval Regional Medical Center in San Diego, California (in 1974). By October 1975 he had completed one and one-third year of his residency in neurosurgery at the Medical University of South Carolina.

2. Dr. Ludwig Kempe, the supervisory neurosurgeon, is a world renown neurosurgeon. He was, and still is, the Chief of the Neurosurgery Department at the Charleston VA Hospital. His curriculum vitae documents his years of experience in neurosurgery and in teaching neurosurgery. Board Certified in neurosurgery in 1960, he was Chief of Neurosurgery at Walter Reed Hospital for many years. Besides publishing articles in and being on the editorial board of international neurosurgical journals, he has written and illustrated an authoritative text in the field of neurosurgery. Dr. Kempe lectures frequently in his area of expertise at

tified, Dr. Kempe performed the more delicate portions of the surgery himself; he handed Dr. Marzluff the surgical instruments to assure the most effective instruments were used.

The patient's blood pressure never dropped abnormally nor did his pulse rate change precipitously during the operative procedure. Thus, the expert testimony established that Mr. Todd did not lose an excessive amount of blood during the procedure. This court finds the performance time of this operation was appropriate and did not signify a lack of care.

15. Post-operatively, Mr. Todd became afflicted with a known complication of this type of surgery called central cord syndrome. This is a descriptive term to describe injury to the center of the spinal cord.

16. Mr. Todd suffered a large post-operative wound hematoma on the first day after surgery. Such a hematoma, when located in the depths of a wound, can independently cause increased neurological deficit or can contribute to a deficit previously produced. Dr. Kempe saw the hematoma, palpated the wound, and evaluated it as being superficial. Dr. Gordon Wannamaker, a neurosurgeon, offered expert testimony, affirming Dr. Kempe's testimony, that this was an accepted, recognized test for determining whether or not a hematoma was superficial. Dr. Wannamaker also testified that it was extremely unlikely that the plaintiff's injuries were caused or added to by a deep wound hematoma; a wound hematoma would not manifest itself in the spinal cord's center, but would damage the entire cord. It is clear that if this hematoma was a deep wound hematoma, then a reoperation should have been carried out and that a failure to return to surgery would be a breach of recognized, accepted medical procedure and a breach of the defendant's duty of care. However, there is no evidence on the record to indicate that

the wound was anything but a superficial hematoma. This court finds that failure to return to surgery under the facts in this case was not a breach of the defendant's duty of care.

17. Mr. Todd's condition has remained essentially unchanged although he has undergone extensive physical therapy and several operations on his hands.

18. Mr. Todd learned of his injury on October 4, 1975, when he regained consciousness following his operation on October 1. However, he did not know his condition was permanent until he was so informed by a VA doctor in 1979.

19. Mr. Todd did not discover the *cause* of his injury until June, 1980, when he was examined by Dr. Exum Walker in Atlanta, Georgia. Mr. Todd's attorneys shortly thereafter informed him that the cause of his injury was the surgical procedure.

20. I further find that, beginning shortly after his surgery in 1975, the plaintiff made repeated inquiries to Dr. Marzluff as to the cause of his condition. Dr. Marzluff would only respond that Mr. Todd would get better and never informed Mr. Todd of the cause of his injury. Mr. Todd's testimony as to these facts was uncontradicted by Drs. Marzluff and Kempe at trial. Nor is there any indication in the plaintiff's voluminous medical record that any VA doctor ever informed him that surgery was the cause of his paralysis.

21. I find that the plaintiff did not earlier discover the true cause of his injury because of his erroneous belief that he may have been injured during a fall at some time following his surgery.

22. I find that the government has suffered no prejudice due to the fact that the plaintiff did not file his administrative claim until almost five (5) years after his operation. Mr. Todd's medical chart and other pertinent records were readily available and introduced into evidence at trial.

neurosurgery conferences throughout the world. However, his involvement in the mainstream of neurosurgery research and teaching has not removed him from the practice of neu-

rosurgery. Before 1975, and continuing to the present time, Dr. Kempe performs delicate neurosurgical procedures almost daily.

The surgeons involved in the trial both testified that they remembered Mr. Todd's case well because of the unusual outcome. Thus, even though I have found that the statute of limitations was tolled until 1980, when Todd discovered the cause of his injury, I find that this ruling has in no way hampered the government in presenting a defense.

## CONCLUSIONS OF LAW

This court has proper subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1346(b).

### Statute of Limitations

■ This court concludes that, for the reasons outlined in the previous order of this court granting the plaintiff's motion for summary judgment, that the plaintiff's action was timely brought. As an additional ground for that conclusion, I find that the plaintiff was continuously treated by the Charleston Veterans Administration Hospital at least through November 5, 1979. Dr. Kempe testified that he, as Chief of the Neurosurgery Service, was responsible for Todd's treatment beginning in September of 1975. Mr. Todd continued under the care of the Neurosurgery Service at least as late as September 4, 1979. Other services at the hospital also provided care for Mr. Todd. Because Mr. Todd was continuously under the care of Dr. Kempe and other Charleston VA doctors until late 1979, the "continuous treatment rule" excuses him from having failed to any sooner file his administrative claim. Mr. Todd was under the care of the hospital for all but three months after his operation on October 1, 1975. During the period from December 17, 1975, until March 17, 1976, Mr. Todd was undergoing a rehabilitation program at the VA Spinal Cord Injury Center in Richmond, Virginia. Perhaps, during that three-month period the statute of limitations was not tolled. However, the court need not reach that issue since the plaintiff's claim was filed on August 5, 1980, nine months after the record shows that he was last treated at the Charleston VA Hospital. Adding the three-month period Mr. Todd was in Richmond brings the total amount of time to exactly one year, which is well within the two-year period of limitations.

My conclusion that Mr. Todd's action was timely brought is supported by the case of *Tyminski v. United States,* 481 F.2d 257 (3rd Cir.1973), which held, on facts almost identical to those in the instant case, that a claim filed almost ten years after surgery and a consequent injury was timely. There, the district court had found that, although Tyminski had been paralyzed shortly after his surgery in 1957, his claim did not accrue until he discovered the specific acts upon which his claim was based. His claim, filed in 1967, was based on the failure to reoperate to remove a post-laminectomy hematoma. The trial judge also held that Tyminski was excused from sooner discovering the negligent acts because he remained under the care of the VA until 1969, and, when he did inquire about the cause of his paralysis, VA doctors informed him that it was caused by the natural progression of his disease or by a spontaneous thrombosis in his spinal cord. The Third Circuit sustained these findings, holding that they were not clearly erroneous.

Although *Tyminski* was decided before *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), I believe that it remains good law since it was mentioned with implied approval in *Kubrick* at note 7 in the opinion. As stated in my order of April 12, 1982, *Portis v. United States,* 483 F.2d 670 (4th Cir.1973), was mentioned in the same footnote. As I read the Supreme Court's decision in *Kubrick,* the cases cited in that footnote were properly decided, since they applied the rule that a cause of action accrues when the plaintiff knows, or in the exercise of reasonable diligence, should know, the specific acts upon which his claim is based, i.e., his injury and its cause. The essence of the *Kubrick* decision is that accrual of a Federal Tort Claim does not await the plaintiff's discovery of the *legal significance* of the facts of his injury and its cause. It was this extension of the "discovery rule" that

several circuits, including the Fourth Circuit in *Bridgford v. United States,* 550 F.2d 978 (4th Cir.1977), had begun to apply. The Supreme Court criticized those errant decisions in note 8 of its opinion. Thus, it appears clear that *Portis* and *Tyminski* remain controlling, and it is with reliance on those opinions, as well as those cited in my previous order, that I conclude that Todd's claim was timely brought.

### Malpractice

■ The Federal Tort Claims Act directs this court to look to the law of the state where the act or omission occurred in order to determine whether a complaint in negligence warrants relief. *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963). In this case, South Carolina provides the appropriate standards.

■ South Carolina case law requires as elements of proof and as the burden of proof in a medical malpractice action as follows:

[t]he burden of proof of negligence, proximate cause, and injury in a medical malpractice case *is on the plaintiff throughout.* In order to establish liability in a medical malpractice case, plaintiff must prove by a preponderance of the evidence the following:

(a) What the recognized and generally accepted standards, practices and procedures are in the community which would be exercised by competent physicians in the same specialty under similar circumstances.

(b) The physician or physicians and/or hospital personnel in question negligently deviated from the generally accepted standards, practices, and procedures.

(c) Such negligent deviation from the generally accepted standards, practices, and procedures was a proximate cause of the plaintiff's injury.

(d) The plaintiff was injured. (Emphasis added.)

*Ellis v. United States,* 484 F.Supp. 4, 10–11 (D.S.C.1978), citing *Steeves v. United States,* 294 F.Supp. 446 (D.S.C.1968), *Price*

*v. Neyland,* 320 F.2d 674 (D.C.Cir.1963), *e.g., Green v. Lilliewood,* 272 S.C. 186, 249 S.E.2d 910 (1978); *Burke v. Pearson,* 259 S.C. 288, 191 S.E.2d 721 (1972); *Bessinger v. DeLoach,* 230 S.C. 1, 94 S.E.2d 3 (1956).

■ Negligence may not be inferred from a bad surgical result or from a known risk of surgery which may occur. A physician or surgeon is not an insurer of health, and he is not required to guarantee results. He undertakes only to meet the standard of skill possessed generally by others practicing in his field under similar circumstances. *Stottlemire v. Cawood,* 213 F.Supp. 897 (D.C.Cir.1963); *Easterling v. Walton,* 208 Va. 214, 156 S.E.2d 787, 790 (1967); *see Fitzgerald v. Manning,* 679 F.2d 341 (4th Cir.1982).

■ The mere fact that the plaintiff's expert may use a different approach or different instrument in performing surgery is not considered a deviation from the recognized standard of medical care. As the Fourth Circuit stated in *Fitzgerald v. Manning:*

Nor is this standard violated because an expert disagrees with a defendant as to what is the best or better approach in treating a patient. Medicine is an inexact science and eminently qualified physicians may differ as to what constitutes a preferable course of treatment. Such differences as to preference do not amount to malpractice. To constitute malpractice, the proffered expert must testify clearly that there has been a departure from acceptable medical standards, as followed by ordinary, prudent practitioners in [the defendant's] field and community, or in similar communities. 679 F.2d at 347 (Citations omitted.)

The plaintiff has failed to establish a deviation from recognized medical procedure in the manner in which the decompressive laminectomy was performed on the plaintiff. Moreover, proof of a causal connection must be something more than evidence consistent with the plaintiff's theory of how the claimed injury was caused; proof of causation cannot rest on conjecture, and the

mere possibility of such causation is not enough to sustain the plaintiff's burden of proof. *Walstead v. University of Minnesota Hospitals,* 442 F.2d 634 (8th Cir.1971). *Res ipsa loquitur* is not a legal doctrine recognized in South Carolina. *McLain v. Carolina Power & Light Co.,* 286 F.2d 816 (4th Cir.1961).

The proof presented leaves it equally probable that a bad result of the operation may have been due to a cause for which the defendant was or was not responsible. Therefore, recovery for Mr. Todd based on malpractice cannot be had. *Fitzgerald v. Manning,* 679 F.2d 341 (4th Cir.1982); *Watkins v. United States,* 589 F.2d 214 (5th Cir.1979); *Eckert v. United States,* C/A No. 76–2406–1 (D.S.C., Jan. 17, 1980).

### Informed Consent

 A physician has a duty to disclose information to his or her patient in order that the patient may give to the physician informed consent to surgery. A physician should ordinarily disclose risks involved concerning surgery, alternative methods of treatment, risks relating to such alternative methods of treatment and results likely to occur if the patient remains untreated. By the majority rule, the performance of surgery without obtaining the informed consent of the patient is actionable in negligence for failing to adhere to the proper standard of care.

There is no South Carolina authority discussing an appropriate test for proving the causal connection between the failure to disclose and any resulting damage. In the absence of any South Carolina case on point, this court must predict what the Supreme Court of South Carolina would decide if the case was before it. *Nature Conservancy v. Machipongo Club, Inc.,* 579 F.2d 873, 875 (4th Cir.1978), *cert. denied,* 439 U.S. 1047, 99 S.Ct. 724, 58 L.Ed.2d 706.

 Proximate cause in an action under the doctrine of informed consent is based on the "but for" notion of causation; i.e., the defendant's conduct is not a cause of the event if the event would have occurred without it. Prosser, *Torts* (4th Cir.

1971) p. 239. Mr. Todd, therefore, must show that had he known of the risk, he would not have consented to the treatment. Thus, failure to warn of particular consequences or risks of surgery is not *per se* an act of negligence. *Cunningham v. United States,* 683 F.2d 847 (4th Cir.1982). That court stated:

> When a physician fails to warn of possible consequences, courts often must consider whether the failure was the proximate cause of the subsequent consequences. That is, the court must consider whether the patient would have consented to the treatment if he had known of the associated risks. While Virginia courts have yet to consider the question, a majority of courts have applied an objective standard in deciding whether the patient would have consented. These courts have inquired whether a reasonable man in the plaintiff's position would have consented to treatment, even if informed of possible adverse consequences. (Citations omitted.)

*Id.* at 849.

Although the South Carolina Supreme Court has not yet ruled on whether it would apply such an objective standard, "whether a reasonable man in plaintiff's position would have consented to the treatment, even if informed of possible adverse consequences," the U.S. District Court for the District of South Carolina did apply such an objective standard stating "[i]t is the opinion of this Court that the South Carolina Supreme Court would recognize the doctrine of informed consent and apply the objective standard." *John P. Bagley v. United States,* C/A No. 82–565–14 (Feb. 10, 1983).

 The expert testimony was uncontested on the issue of the plaintiff's need for the surgery. Without the surgery, the plaintiff's condition would have deteriorated. The surgery was intended to arrest this deterioration before his spinal cord and nerve roots became even more compressed and thereby damaged. Therefore, even though Mr. Todd contends that he was not

fully informed of, or did not fully understand the inherent risks, a reasonable man, in his position, being fully informed of the risks, would have consented thereto. Thus, the defendant's failure to fully inform cannot be said to be a proximate cause of Mr. Todd's injury.

Mr. Todd's surgical complication is truly unfortunate, and this court has great sympathy with his resulting physical condition, but the defendant in this case cannot be held responsible. Therefore, it is

ORDERED, that this action be, and the same is hereby, dismissed.

AND IT IS SO ORDERED.