**William A. KUBRICK**

v.

**UNITED STATES of America.**

**Civ. A. No. 72–1815.**

United States District Court,
E. D. Pennsylvania.

July 22, 1977.

Benjamin Kuby, Philadelphia, Pa., for plaintiff.

Paul E. Holl, Alexander Ewing, Jr., Asst. U.S. Attys., Philadelphia, Pa., for defendant.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This is a medical malpractice case brought under the Federal Tort Claims Act, 28 U.S.C. § 1346 ("Act"), raising important questions concerning the statute of limitations and the standard of care applicable to specialists in Pennsylvania. The claim arises out of the hospitalization of the plaintiff, William A. Kubrick, in the Wilkes-Barre Veterans Administration Hospital ("VA Hospital") from April 2, 1968 to April 30, 1968, for treatment of osteomyelitis of the right femur. Following surgery, the infected area was irrigated for twelve to thirteen days with a 1% solution of neomycin sulfate administered through a hemovac (evacuation) tube system. The osteomyelitis cleared, but approximately three months after his discharge from the VA Hospital plaintiff began to notice a partial hearing loss and tinnitus (ringing in the ears). His condition grew progressively worse, and there is now no dispute about the fact that

plaintiff suffers from severe bilateral sensorineural hearing loss, or nerve deafness, which is permanent in nature and which cannot be improved by treatment.

The evidence overwhelmingly supports plaintiff's contention that his nerve deafness was caused by the administration of neomycin which, while a highly effective antibiotic, is also ototoxic, *i. e.*, deleterious to the eighth cranial nerve which supplies the ear. The government does not seriously dispute this contention. What is at issue in this case is whether, at the time of the treatment, it was sufficiently well known in the Wilkes-Barre (or similar) medical community, or, alternatively, in the national community of orthopedists, that neomycin administered as a surgical wound irrigant through a hemovac tube system had ototoxic effects such that its administration. to plaintiff was negligent. In order to resolve this issue we must determine whether Pennsylvania would apply a national or similar locality standard to specialists,[1] and we must also examine what was known about the *manner* of administration of the drug, focusing in particular upon the medical distinction between "topical" use of a drug, which imports local application and effect, and "parenteral" use, by which a systemic effect is intended.

It is conceded by the government that the ototoxic effects of neomycin when *parenterally* used were generally known in April 1968. The government contends, however, that the use of neomycin as a surgical wound irrigant through a hemovac tube system was then thought to be a *topical*, not a parenteral use, and concomitantly, that the body's capacity to absorb neomycin when administered in this way was known little, if at all, at that time. The government argues that the plaintiff's VA physician thus cannot be charged with the knowledge that the neomycin was readily absorbed into the body tissues and the blood stream. It further argues that the practices followed in this case were those generally followed at the time, at least in Wilkes-Barre and similar communities, hence malpractice was not committed.

The plaintiff counters that the absorption propensity of neomycin was widely known and that the VA physician who treated him is chargeable with that knowledge. Plaintiff also argues that the dosage of neomycin administered to him was so outrageously high and prolonged that the treating physician in any event should have known of the ototoxic potential. Plaintiff also submits that other nontoxic drugs could have adequately treated the osteomyelitis, which was caused by a staphylococcus infection.

As the foregoing recitation suggests, the trial record is heavily laden with the (conflicting) testimony of expert medical witnesses as to just what was known in the medical community about the properties of neomycin and with excerpts from the medical literature at the time. With respect to the evidence in the medical literature of neomycin's absorption potential, the government argues that the VA doctors are not obliged to read every piece in the vast and burgeoning medical literature.

As will appear from the findings of fact and discussion which follow, we find: (1) that the plaintiff's VA physician is chargeable with what we find to have been generally available knowledge of both the body's ability to absorb neomycin when administered as it was to the plaintiff, and its potential ototoxic effect; (2) that the dosage given the plaintiff was excessive; (3) that drugs other than neomycin could and should have been used to treat the staph infection; and (4) that the hemovac tube system was not properly maintained. Accordingly, we conclude that the VA physician in charge was guilty of medical malpractice which proximately caused plaintiff's bilateral hearing loss.

The liability aspect of this case, however, has another facet. For what is also at issue is whether plaintiff's suit is time-barred by the Act's two-year statute of limitations. 28 U.S.C. § 2401(b).

The plaintiff experienced tinnitus and first noticed a diminution of his hearing in

---

1. *See* Discussion at pp. 186–188 *infra.*

June 1968. Thereafter, he visited a series of otologists about the progressively worsening hearing loss. At some point during the consultations the plaintiff was advised of the possibility that it was the neomycin which caused it. In April 1969 plaintiff submitted a claim to the Veterans Administration seeking disability benefits to compensate him for his hearing loss on the basis of the opinion of a Philadelphia ear, nose and throat specialist that it was "highly possible" that the neomycin had caused plaintiff's tinnitus and deafness. In August 1969, the VA denied plaintiff's claim on the basis that there was no causal relationship between the neomycin administration and the hearing loss, and also for the reason that there was no evidence of negligence of any sort on the part of the government. Thereafter plaintiff instituted various requests for reconsideration and appeals, in the belief that even without negligence he was entitled to an increase in disability payments. In addition, he wrote to various public officials in aid of his efforts to obtain vindication before the Veterans Appeals Board.

It was not until June 1971, that plaintiff discovered, upon the opinion of an ear specialist, that the government's administration of neomycin may have been negligent. This suit was filed in September 1972. In January 1973, plaintiff filed a form 95 administrative claim which was rejected a few months later in April 1973. Before that and for a long period thereafter, the VA unequivocally maintained that there was no negligence.

The government has moved to dismiss on the grounds that the statute of limitations had expired prior to the filing of an administrative claim, and that in any event plaintiff had failed to file a standard form 95 (administrative) tort claim in the proper sequence. The Act's statute of limitations reads:

A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years *after such claim accrues.* [28 U.S.C. § 2401(b) (emphasis added).]

The critical statute of limitations issue in this case is, therefore, when plaintiff's claim accrued, and we shall discuss the applicable standard below. It will be necessary, in the course of that discussion, to analyze and refine the prevailing rule in such matters.

As the foregoing discussion suggests, the government asserts that the claim accrued in the summer of 1968, when plaintiff first noticed his hearing loss, or at least in April 1969 when he submitted a claim to the VA evincing knowledge of the high possibility that the neomycin administration caused his deafness. In either event, the present suit would be time-barred.

The plaintiff, on the other hand, contends that it would be harsh and improper to construe the statute of limitations so as to hold that plaintiff's claim accrued at a time when he had every reason to believe, based *inter alia* upon the VA's own written opinions, that there was no causal relationship between the neomycin administration and the hearing loss, and no negligence on the part of the government. In plaintiff's view the claim did not accrue (hence the statute of limitations did not start to run) until plaintiff, in the exercise of reasonable diligence, could have suspected that he was the victim of improper medical care or negligence. This occurred, plaintiff says, in June 1971, nineteen months prior to the filing of his administrative claim.

For the reasons which will appear in the findings of fact and in the discussion which follows, we conclude that plaintiff's suit does not run afoul of the statute of limitations or the administrative filing requirements. Finding that defendant has committed malpractice and that plaintiff is irreversibly deaf (though he is an excellent lip reader) and has suffered related psychiatric problems, we will award substantial damages. This opinion constitutes our findings of fact and conclusion of law under Fed.R.Civ.P. 52(a).

II. *Findings of Fact*
 A. *Plaintiff's Hospitalization and Treatment*

On April 2, 1968, the plaintiff, who then possessed full normal hearing, was admitted

to the VA Hospital in Wilkes-Barre for treatment of a condition which was diagnosed as osteomyelitis of the right femur. He thereupon came under the primary care of Dr. H. P. Wetherbee, an orthopedic surgeon employed by the VA.

On April 3, 1968, Dr. Wetherbee operated on the plaintiff. The operative procedure disclosed a small pocket of purulent material along the shaft of the right femur. A swab was taken of the purulent material for smear, culture and sensitivity studies. During the operative procedure, two hemovac tubes were introduced into the depths of the wound, one proximally and the other distally. Thereafter the surgical wound was closed loosely and a dry sterile dressing applied.

The culture test performed on the purulent material indicated that the organism present was a beta hemolytic staphylococcuscoagulase positive (hereinafter referred to as "staph"). Sensitivity tests taken revealed that the staph was susceptible to treatment with the following medication: oleoan; terramycin; tetracycline; chloromycetin; penicillin; streptomycin; prostaphlin; erythromycin; polycillin; furadantin; novobiocin; mandelamine; neomycin; kanamycin; keflin; lincocin and daotriacetyloleandomycin. On April 5, 1968, Dr. Wetherbee prescribed two antibiotics to treat the osteomyelitic condition: polycillin orally and neomycin as a surgical wound irrigant administered through the use of the hemovac tubes.

At 4:00 p. m. on April 5, 1968, a 1% neomycin drip, at the rate of sixty (60) drips per minute was begun, and continued twenty-four (24) hours a day until April 18, 1968. At that rate plaintiff could have received as much as 5,760 cc. of 1% neomycin solution during each twenty-four hour period; and in any event, he did receive at least 4,320 cc. of 1% neomycin solution during each twenty-four hour period. This translates to at least 43.2 grams of neomycin during any twenty-four hour period. Thus, plaintiff was administered at least 549 grams and perhaps as much as 732 grams of neomycin during his hospitalization in April 1968. Plaintiff remained in the hospital until April 30th. When he was discharged on that date the osteomyelitis had cleared.

## B. *Plaintiff's Loss of Hearing and the Accrual of His Claim*

In mid-June 1968, plaintiff first noticed a ringing sensation in his ears and some loss of hearing. He sought medical care by visiting his family doctor, Dr. Mazaleski, who in turn referred him to an ear specialist, Dr. Soma, in Scranton, Pennsylvania. On August 27, 1968, Dr. Soma performed an audiometric test on plaintiff and formed the opinion that the ringing sensation and loss of hearing was due to bilateral nerve deafness of unknown etiology.

On September 9, 1968, plaintiff was examined by another ear specialist, Dr. Cole of Geisinger Medical Center in Danville, Pennsylvania. Dr. Cole, after examination and an audiometric test, diagnosed the hearing loss and ringing sensation as bilateral sensorineural deafness. On September 10, 1968, plaintiff returned to the VA Hospital ear, nose and throat clinic, where he informed a Dr. Fischoff of the ringing sensation and loss of hearing. Dr. Fischoff administered an air conduction test. Plaintiff was not informed of the results of the test, but was sent to the dispensary for a prescription to help his condition. The plaintiff was still bothered by the ringing sensation and hearing loss which was becoming progressively worse, and in November 1968, was examined and tested by Dr. Joseph A. Sataloff, an ear, nose and throat specialist in Philadelphia. Dr. Sataloff, after physical examination and an air conduction test, opined that plaintiff was suffering from bilateral hearing loss. Dr. Sataloff told plaintiff he would try to reduce the ringing sensation and impede the continued degeneration of hearing loss, and that he would also send for the VA hospital records in an effort to find their etiology. This commenced a series of visits with Dr. Sataloff for treatment of plaintiff's hearing condition that continued until the summer of 1971.

Dr. Sataloff testified that he informed plaintiff during his initial visit, and during many visits thereafter, that the antibiotics he had received during his hospitalization in April of 1968 had caused his hearing problems. We do not credit this testimony. Instead we find that Dr. Sataloff told plaintiff and reported to the Veterans Administration, insurance companies, and others that it was his opinion that it was "highly possible" (or other similar language) that the hearing loss was caused by the neomycin solution given in the Veterans Administration Hospital. For instance, on June 30, 1969, Dr. Sataloff completed and submitted a certificate of attending physician for the Veterans Administration in which he stated "[t]here is an excellent chance that Mr. Kubrick's present hearing loss is the result of neomycin toxicity." This submission followed the filing by plaintiff on April 16, 1969, of a claim to the Veterans Administration for disability benefits to compensate him for his hearing problems based upon Dr. Sataloff's opinion that the neomycin had been the "possible" cause of his deafness.[2] We find that at no time prior to mid-1971 did Dr. Sataloff advise or in any way indicate to the plaintiff by word or writing that there was malpractice or negligence in the administration of neomycin at the VA Hospital in April 1968. We also find that it was reasonable for plaintiff to continue to believe, even after consultation with Dr. Sataloff, that his deafness was not the result of malpractice in view of the technical complexity of the question whether his neomycin treatment was unduly hazardous.

On August 11, 1969, a Veterans Administration Board of Physicians was convened to consider whether plaintiff's hearing loss had any relationship to the use of neomycin during the period of his hospitalization in April 1968. The Board thereafter informed plaintiff that his claim had been denied on the basis that no causal relationship existed between the neomycin administration and the hearing loss, as well as for the reason that there was no evidence of "carelessness, accident, negligence, lack of proper skill, error in judgment, or any other fault on the part of the Government." Moreover, on September 5, 1969, Mr. McCauley, the Adjudication Officer in the Veterans Administration Center at Philadelphia, advised the plaintiff that the Veterans Administration had found that his hearing loss was not attributable medicinally or medically to his April 1968 hospitalization, and that his claim for compensation as a result of his hearing loss was therefore disallowed.

On September 25, 1969, plaintiff submitted a "Statement in Support of Claim" in which he expressed his disagreement with the Veterans Administration's denial, stating that Dr. Sataloff had requested and reviewed all past and medical history and had informed him that the medication given him during his hospitalization in April 1968 was responsible for his loss of hearing. On September 26, 1969, the Veterans Administration issued a "Statement of the Case" in plaintiff's appeal which again declared that plaintiff's claim was denied due to lack of causal relationship and a lack of evidence showing carelessness, accident, negligence, lack of proper skill, error in judgment, or any other fault.

On January 13, 1970, plaintiff was admitted to the VA Hospital in Wilkes-Barre, and remained as an in-patient until February 16, 1970. During that time, a complete audiometric examination by the ears, nose and throat clinic confirmed the fact that he suffered from a severe bilateral sensorineural hearing loss which completely foreclosed speech discrimination and for which a hearing aid would be of no assistance.

An important development in the history of this matter occurred on May 20, 1971, when the Veterans Administration sent plaintiff a "Supplemental Statement of the

---

2. On September 16, 1969, Dr. Sataloff had written to Mr. Peter Dudish of the Disabled American Veterans in Wilkes-Barre stating that "[t]here is a very excellent possibility that his hearing damage could have been due to the use of neomycin by irrigation." As will more fully be seen, and as we now note, plaintiff's persistence in his disability claim evidences his view that he was entitled to such payments purely on the basis of the causal relationship.

Case" containing the following report of a Veterans Administration field examiner, J. A. Nagy:

VA field examination report: Dr. J. J. Soma stated after examining the veteran on August 27, 1968, he concluded that the Veteran's problem was a result of his employment in the machine shop. He stated he planned on treating the veteran along such lines, but he never came back for further treatment.

That Veterans Administration Statement identified two reasons for denial of compensation for plaintiff's hearing loss:

The additional evidence including the current Veterans Administration examination does not show any veteran's hearing disability was due to any carelessness, lack of medical skill, negligence or error in judgment, mal-practice or other knowledge on the part of the staff of the Veterans Administration Hospital.

The Veteran's own ear, nose and throat specialist indicated that the hearing loss was felt to be due to the veteran's previous employment as a machinist and was due to acoustic trauma.

On June 2, 1971, plaintiff confronted Dr. Soma in his office with the opinion attributed to him in the VA's Supplemental Statement of the Case. Dr. Soma, upon examining the Supplemental Statement, informed the plaintiff that the statements attributed to him were never made by him. At that juncture, Dr. Soma advised plaintiff that it was his opinion that neomycin

should not have been administered in April 1968, and that plaintiff's permanent hearing loss was solely caused by neomycin absorption. Dr. Soma's statement to plaintiff on June 2, 1971, was the first time that any doctor or lay person had suggested to plaintiff and/or his wife that negligence was involved in the administration of neomycin by the Veterans Administration Hospital physician in April of 1968. Plaintiff thereafter retained counsel who represented him before the VA Board of Appeals and later in the present lawsuit.

In the period between the denial of plaintiff's initial claim and the summer of 1970, plaintiff and his wife had written various letters to Veterans Administration officials and to their United States Senators in which they contradicted and denied the VA's finding of no causal connection between the administration of the neomycin solution in April of 1968 and the subsequent development of the hearing loss sustained by the plaintiff. The government makes much of the language of some of those letters,[3] suggesting that they reflect an awareness by plaintiff that the VA doctor was or may have been negligent. We draw no such conclusion, believing them to represent a flurry of rhetoric induced by desperation. We credit plaintiff's testimony that he did not, prior to his June 1971 interview with Dr. Soma, suspect that there was negligence involved. We find that as of the date of those letters plaintiff be-

3. On December 10, 1969, plaintiff wrote to United States Senator Richard S. Schweiker, complaining about the Veterans Administration's denial of his claim for benefits and contending that he was "turned down by the Veterans Administration . . . who maintain their hospitals are not capable of error or misjudgment. . . ." On December 29, 1969, plaintiff submitted a six page appeal of his claim to the Board of Veterans Appeals in which he attempted to contradict the findings of the Veterans Administration regarding the hospital procedures, disagreed with the Veterans Administration's conclusion of no negligence, stated his belief that his injury was the "outcome of error," and attempted to convince the Board that Dr. Sataloff's opinion about the causal relationship was correct. On October 15, 1970, plaintiff signed and sent a letter, writ-

ten by his wife, to the Administrator of Veterans Administration Affairs, Donald E. Johnson. This letter begins by citing a case in which a friend of Mrs. Kubrick became injured and eventually died as "the result of human error" in a hospital. It goes on to state that plaintiff lost his hearing "as the result of a Medical Error . . . ." and suffered the consequence of that error, and suggested that Mr. Johnson could recommend a hospital or doctors capable of correcting the error. And finally, on October 27, 1970, plaintiff wrote to Mr. Clayman of the Veterans Administration in Philadelphia in a further attempt to have the Veterans Administration reverse its decision. This letter stated, in part, that plaintiff "had normal good hearing before this drug had been administered without using proper precautions."

lieved his entitlement to VA benefits followed if the neomycin administration caused the hearing loss without negligence. Furthermore, plaintiff's belief that there was no malpractice was reasonable in view of the technical complexity of the question whether his neomycin treatment involved excessive risks, the failure of any of his doctors to suggest prior to June 1971 the possibility of negligence, and the repeated unequivocal assertions by the Veterans Administration that there was no negligence on the part of the government.

On August 9, 1972, the Board of Veterans Appeals published its "final" decision in which compensation for plaintiff's hearing loss was again denied.[4]

On September 14, 1972, plaintiff's complaint in this Court was filed. Plaintiff did not file a standard form 95 setting forth a claim (administrative claim) against the United States for medical malpractice until January 13, 1973. On April 13, 1973 the (administrative) claim was rejected by letter to counsel for plaintiff from John H. Kerby, Assistant General Counsel for the Veterans Administration.

Plaintiff's persistent efforts to seek vindication before the VA finally bore fruit in the form of a July 15, 1975 decision, upon reconsideration, of the VA Board of Veterans Appeals. The Board entered findings of fact as follows:

1. Mr. Kubrick was placed on neomycin irrigation by the Veterans Administration during hospitalization in April 1968 for osteomyelitis of the right femur.

2. Defective hearing was noted in about June 1968 and sensorineural deaf-ness was diagnosed during Veterans Administration hospitalization from January to February 1970.

3. Defective hearing may have been caused by the neomycin irrigation.

4. The benefit in issue was denied in Board of Veterans Appeals decision promulgated August 9, 1972, which decision now appears to have been erroneous.

5. There was fault on the part of the Veterans Administration in the manner of neomycin irrigation which is reasonably determined to have resulted in sensorineural hearing loss.

The Board of Veterans Appeals based its findings of fact upon its evaluation of the facts wherein it stated:

The Board's finding that the veteran's defective hearing may have been caused by the neomycin irrigation stands and is supported by the evidence. However, a further in-depth review supports the claimant's assertions of improper administration of the drug. The amount utilized was of such quantity, when considered with the size and depth of the wound and the form of drug administration, as to support a finding the procedure deviated from accepted medical practices and procedures, indicating fault on the part of the Veterans Administration based on the data previously on file.

The findings of the Board of Veterans Appeals are recited by way of background. The government made no such concessions at trial, and, indeed, vigorously disputed the plaintiff's allegations of malpractice. Our findings on that subject are *de novo* without reference to the Board's decision.[5]

---

4. The decision found as follows:

 1. Mr. Kubrick was placed on neomycin irrigation by the VA Hospital during hospitalization in April, 1968 for osteomyelitis of the right femur. Beginning in approximately June, 1968 defective hearing was noted.

 2. Sensorineural deafness was diagnosed during VAH hospitalization from January to February 1970.

 3. That there is evidence to show that defective hearing may have been caused by neomycin irrigation.

 4. The treatment and care afforded the Veteran in connection with use of neomycin

was administered by duly qualified and trained personnel, in accordance with acceptable medical practices and procedures, and negligence, error in judgment or other indicated faults are not shown.

5. The trial in this case was delayed considerably when, following that decision, the parties negotiated for many, many months with a view towards a total resolution of the case. The negotiations proved unsuccessful. The trial was further delayed for considerable time while plaintiff, having discharged previous counsel, sought new counsel.

## C. Was the Veterans Administration Physician Guilty of Malpractice?

The drug neomycin was first discovered by Dr. Selman Waksman in 1950. Soon thereafter, it was discovered that the drug had nephrotoxic (kidney damage) and ototoxic (eighth cranial nerve damage) side effects. A substantial body of medical literature, prior to April 1968, warned of the hazard of irreversible ototoxic effects, often including permanent bilateral deafness. As we have noted in our Preliminary Statement, however, the battleground in the malpractice aspect of this case is more narrowly focused, and concerns the knowledge in medical communities similar to Wilkes-Barre and among orthopedists in general, about the absorption propensity of neomycin when used post-operatively in an irrigating solution.

The government offered the testimony of three orthopedic surgeons as expert witnesses: Dr. Richard Godshall, chief of orthopedic surgery at Quakertown and Grandview Hospitals in Bucks County, Pennsylvania; Dr. Richard Kaplan, a Philadelphia orthopedic surgeon associated with various teaching hospitals; and Dr. Sanford Sternlieb, an orthopedic surgeon in Wilkes-Barre, Pennsylvania and former instructor at Jefferson Medical School in Philadelphia. Each of the Government's orthopedic experts testified that the procedure employed in administering the neomycin to Mr. Kubrick constituted proper and adequate treatment as of April 1968, and that neomycin was frequently used by orthopedic surgeons practicing in Wilkes-Barre and similar medical communities in 1968 to irrigate and disinfect surgical wounds post-operatively. Each of the government's orthopedic experts testified that although the dangers of ototoxicity when administering neomycin intramuscularly (IM) and intravenously (IV) were generally recognized in their respective medical communities in April 1968, nevertheless, it was not then apparent that any significant potential for absorption existed when the drug was used as a washing agent in a 1% irrigating solution.[6] These experts also testified that the irrigation of plaintiff's surgical wound in April 1968 with the 1% solution of neomycin, for a period of twelve to thirteen days, was appropriate since the practice at the time was to continue the local antibiotic treatment until the patient's fever dropped and the infection subsided. Before considering this testimony it will be helpful to summarize the position of plaintiff's experts.

We first identify the common ground between the plaintiff's and defendant's experts. Plaintiff's experts did not take serious issue with the appropriateness of the technique used by Dr. Wetherbee of making a deep surgical wound to facilitate the draining of the infection. Moreover, they agreed that it was appropriate to use an antibiotic in solution as a wound irrigant in a hemovac system to "wash the tissues" and eradicate the infection. Additionally, they did not dispute that neomycin is an effective antibiotic. However, they seriously questioned its use in plaintiff's case.

The threshold medical problem, as plaintiffs first expert, Dr. Linwood Tice, an eminent pharmacologist, described it, was to identify the "drug of choice." Dr. Tice testified that, after the laboratory tests revealed the nature of the offending organism (staph) it was clear that polycillin (ampicillin) or perhaps penicillin, but not neomycin, were the drugs of choice because of the sensitivity of the staph in question to those drugs and the absence of potential side effects.

Dr. Tice's testimony introduced the distinction between the topical and parenteral use of a drug. A typical parenteral use is by IV or IM injection beneath the surface of the skin, where the body tissues will absorb it and it will have a systemic effect. A classical topical use is by application to the skin surface where no such absorption is anticipated. The parties agree that it was

---

6. Dr. Sataloff corroborated their testimony, although he also testified that *he* knew about the problem and that, as early as 1968, he had visited numerous hospitals in Pennsylvania to inform surgeons about the potential ototoxic dangers of neomycin.

known in 1968 that parenteral use of neomycin implicates grave risk of damage to the eighth cranial nerve and also of severe kidney damage. Dr. Tice testified that the administration of neomycin in water soluble solution in deep tissues, even though as part of an evacuation (hemovac) tube system was a parenteral use because of the absorption of the neomycin into the capillaries and the blood system. Dr. Tice also testified that: (1) according to the VA Hospital records, the hemovac tube system was not functioning properly, increasing the risk of absorption; (2) that the dosage of neomycin was excessive both in terms of hourly amount and duration; (3) that the dangers of *this* use of neomycin were known in the medical community and in the literature in April 1968;[7] and (4) that audiometric tests should have been made during the course of therapy as a precautionary measure.[8]

Another expert witness for the plaintiff was Dr. Thomas Gain, a Philadelphia surgeon associated with Hahnemann Hospital. Dr. Gain testified that there was no way to construe this irrigation as topical, and that it was plainly parenteral. Illustrations of topical use given by Dr. Gain were applications to external surfaces or mucous membranes, use as a rectal suppository, or in highly limited quantity for "gut" sterilization as a preoperative measure. Dr. Gain described the dosage administered to the plaintiff as "astronomical." He testified that the dangers of the type of administration at issue were well known in 1968, and that the problem was well defined and outlined in the medical literature at that time. Indeed, the systemic absorption problem was sufficiently well known at that time, according to Dr. Gain, that acceptable medi-

cal practice involved monitoring of the kidney function and possibly the hearing function during any parenteral use.

Plaintiff's final witness on this subject was Dr. J. David Hoffman, an orthopedic surgeon associated with Jefferson Hospital in Philadelphia. Dr. Hoffman testified trenchantly that by 1968 physicians at Jefferson were keenly aware of the ototoxic dangers of using neomycin in irrigating solution.[9] Moreover, Dr. Hoffman testified that the effect of using neomycin in this fashion was singularly parenteral, not in the strictest sense of direct intramuscular or intravascular introduction, but because of its introduction into an open bloody wound, confined in a cavity deep in the body yet adjacent to capillary and lymphatic channels. Dr. Hoffman described the surgically created irrigation system as significantly exacerbating the absorption problem. Under such a system, the tissues are bathed and supersaturated in an airtight closure, but the blood vessels are not closed off. Dr. Hoffman testified that entry of the toxic material into the capillary system was obvious, even from Newton's Laws, and that the dangers of this procedure should have been known by any specialist— anywhere—in 1968.

Dr. Hoffman also testified that the hemovac system was not functioning and that the dosage was extraordinarily high—the "highest profusion" he had ever seen, heightened by the nonfunctioning system. Additionally, he testified that neomycin was not the drug of choice, but that penicillinase or chloromycetin should have been used. In Dr. Hoffman's view (and, he said, that of the staff at Jefferson Hospital),

7. Dr. Tice, as a pharmacologist, testified about the neomycin entry in the 1968 edition of Physicians Desk Reference ("PDR"), the standard reference used by physicians on the properties of different drugs, to which he had contributed. That edition plainly warned of the potential ototoxicity of neomycin, but it does not help with the factual question in this case because it did not address the differential consequences of various ways of administering the drug.

8. Plaintiff never received an audiometric examination during the course of his Veterans Ad-

ministration Hospital hospitalization in April 1968. At no time subsequent to the operation on the morning of April 3, 1968, was a blood test, urinalysis or BUN performed; the latter tests would have demonstrated nephrotoxic effects of the drug.

9. Dr. Hoffman also testified that neomycin, even in the mid-1950's, was known to be "notoriously" ototoxic, and to be a virtual "time bomb."

neomycin should be used only in exceptional circumstances, in the case of an extremely resistant mixed infection. Plaintiff was not, he stated, so sick that he needed such a dangerous drug.

.We credit the testimony of Dr. Tice, Dr. Gain, and Dr. Hoffman, as related above, and find that the government, acting through Dr. Wetherbee, was negligent: (1) in the choice of neomycin as a drug for treating the plaintiff's condition in 1% solution as a surgical wound irrigant; (2) in administering a considerable overdosage; (3) in failing adequately to monitor the effects of the dosage; and (4) in permitting a malfunctioning hemovac tube system to continue in operation. Furthermore, we find that Dr. Wetherbee's negligence was the proximate cause of plaintiff's sensorineural deafness.

There was also much testimony as to what had been reported in the medical literature as of April 1968 about dangers of administering neomycin as Dr. Wetherbee did to the plaintiff. The government conceded that in June 1969, an article was published in the New England Journal of Medicine announcing the apparent potential for absorption of neomycin when used in irrigating solution. Although the government concedes that the literature abounded with declarations of the ototoxity of neomycin in other contexts, it contends that this June 1969 article was the first such announcement to the medical community at large of the dangers of using it for irrigation. Plaintiff's experts on the other hand testified that the pre-1968 medical literature, including textbooks, warned of the dangers that neomycin could be absorbed into the system and of the problems involved in using it in irrigating solutions. We credit the testimony of plaintiff's experts that the medical literature as of April 1968 contained sufficient and sufficiently widespread information as to the ototoxicity and absorption properties of neomycin to have warned Dr. Wetherbee of the dangerousness and hence the impropriety of his treatment.[10]

### D. The Applicable Standard of Care

It is clear under Pennsylvania law that the conduct of a physician is measured by no less than the standard of the average physician in the medical community in which he practices or in similar communities. We have also concluded that as to specialists or those holding themselves out as specialists the standard is a national one, i.e., the standard of the average specialist among the national community specialists. See Discussion infra. The government contended at trial not only that the applicable standard of care was that followed by surgeons in the Wilkes-Barre area, or a similar (small city) community, but also that this standard was distinctly different from, and inferior to, that followed in Philadelphia, and particularly at teaching institutions in Philadelphia. (While we will refer to the concept of "standard of care," underlying that is the requisite standard of knowledge of developments in medical research.) The plaintiff on the other hand argued that any distinction between teaching and non-teaching institutions was artificial and untenable; that there was no difference in the applicable standard between Wilkes-Barre and Philadelphia; and that in any event, the Wilkes-Barre (or similar locality) standard was breached. While the standard of care question is principally a legal one, it has factual ingredients to which we now turn.

10. We find merit in the reliance by plaintiff's experts upon: (1) a 1958 article in New England Journal of Medicine on the ototoxicity of neomycin; (2) a 1967 article on the treatment of bone infections by closed irrigation with a non-toxic detergent and various antibiotics, in the Journal of Bone & Joint Surgery; (3) a 1967 text on deafness in childhood; (4) a 1963 article on antibiotic ototoxicity in the British Medical Journal; (5) a 1966 article on hearing loss in a child following use of neomycin, in the Medical Annals of the District of Columbia; (6) various neomycin package inserts prepared by the manufacturers; (7) a 1964 article on neomycin ototoxicity in the Archives of Otolaryngology; (8) a 1965 article on audiotoxicity and nephrotoxicity in the Journal of the American Medical Association; and (9) a textbook entitled Principles and Practice of Antibiotic Therapy.

At the threshold, we find that Dr. Wetherbee held himself out as an orthopedic surgeon, a specialist, and was practicing orthopedic surgery on the plaintiff even though he was not Board Certified at the time. Next, based upon the testimony of plaintiff's experts, we find that there is essentially no difference in the standard of orthopedic specialist care between Wilkes-Barre and Philadelphia. We note in this regard, that the two experts in orthopedic surgery produced by the government, while both practicing in small communities (Wilkes-Barre and Quakertown, Pa.), were trained in Philadelphia teaching institutions. We also find that, at least with respect to the issues involved in this case, any difference between the standard of knowledge attributable to teaching hospitals and non-teaching hospitals is so attenuated as to be non-existent. We reach that conclusion for several reasons. First, we are concerned here not with some esoteric aspect of medicine or rare phenomena, but with a garden variety administration of an antibiotic to treat a common disease with which orthopedic specialists are daily concerned. Second, we believe that the wide and free interchange of scientific information through reference works, medical journals, and medical conferences is (and was in 1968) so broad that it tends to homogenize the level of medical knowledge about matters such as the properties and dangers of various antibiotics. Third, we find that there was, in 1968, widespread knowledge of the risks of using neomycin, which knowledge cut across the medical community in its entirety. Finally, we find that Dr. Wetherbee was in breach of the standard of care applicable in Wilkes-Barre (or similar locality) in 1968 as well as of the national standard applicable to orthopedic specialists at that time, because by either standard he should have known that the course of treatment which he followed was improper.

### E. Damages

The plaintiff, now 48 years of age, was in good health and possessed full normal hearing before his treatment at the Wilkes-Barre VA Hospital.[11] A lifelong resident of Northeastern Pennsylvania, he was then employed by R.C.A. at Dunmore, Pennsylvania as a maintenance machinist, making parts for machines and repairing machine parts. Plaintiff had been a machinist for a number of years, with prior employment at the Tobyhanna Army Depot and Passaic Aircraft. His earnings at RCA in 1967 were $7,881; in 1968 he earned $6,347; and in 1969, the last year he was able to continue working, he earned $8,799. Plaintiff also enjoyed fringe benefits valued at an additional 9%.

The plaintiff's hearing loss and tinnitus (ringing in the ears) grew progressively worse after the accident. It is undisputed that he suffers from severe bilateral sensory nerve deafness, which is irreversible. He has no serviceable hearing, and a hearing aid is of no value to him. Plaintiff's problem is a function of his lack of capacity for discrimination; while he can hear sounds and noises, they are as though the utterers were speaking some unfamiliar tongue. He is also unable to perceive, hence to enjoy music. Fortunately, plaintiff is an excellent lip reader, and can communicate and carry on full and intelligent conversations through that vehicle. Plaintiff's ability to hear some sounds, especially some bass tone vowels, assists his lip reading. Plaintiff continues to suffer from tinnitus which will worsen over the years.

Plaintiff's hearing loss has led to a profound psychiatric problem which has disrupted the fabric of his family and personal life. Prior to the events in question plaintiff was good natured, active in fraternal affairs, and an excellent family man. He has now withdrawn into a shell. He sleeps and eats alone; he shuns all forms of social intercourse and recreational activity, even with his family. He is constantly and extremely irritable, distrustful of everyone around him, and profoundly depressed. He is intermittently threatening, afflicted from time to time with barely controllable rage,

---

**11.** Plaintiff did suffer from the residuals of a low back injury incurred in the U.S. Army in Japan, for which he was receiving a VA disability payment.

and oppressed by a feeling of hopelessness about his life.

Dr. Lord Lee-Benner, a psychiatrist who has examined and treated the plaintiff, testified that the plaintiff suffers from severe depression,[12] resulting from his hearing loss and also from his consequent inability to earn a living. He confirmed the relationship between the symptoms we have just described and the events which give rise to the government's liability, and stated that plaintiff was unable to perform any gainful employment because of his psychiatric condition. While recommending psychotherapy (2 or 3 times per week), Dr. Lee-Benner's prognosis was guarded. We credit this testimony except for the prognosis.

The psychiatrist who examined plaintiff on behalf of the government, Dr. Joseph J. Peters, took a considerably different view. To begin with, Dr. Peters testified that plaintiff possessed a "pre-morbid" personality before the events at issue in this case [13] which would in any event have led to an involutional melancholia in plaintiff's mid-fifties. Dr. Peters opined that this condition predisposed plaintiff to serious sequelae from the hearing loss. While he did not dispute that plaintiff is seriously depressed and unable at present to be gainfully employed,[14] Dr. Peters testified that if the present litigation were resolved favorably to plaintiff so that he felt vindicated, he could definitely be rehabilitated with psychiatric care. We credit Dr. Peters' testimony and find that plaintiff can be rehabilitated with psychiatric care.

We find that plaintiff has been unable to work since January of 1970 because of his psychiatric condition. His past loss of earnings, including loss of fringe benefits, amounts to $94,000.[15] We believe and find that plaintiff can be rehabilitated and resume gainful employment within one year, if he receives psychiatric care, medication, and some vocational training. Dr. Saul Leshner, a vocational and rehabilitation expert, testified that functionally deaf people can perform a wide range of jobs. He stated that while plaintiff could not work in the vicinity of moving cranes or heavy equipment, he could perform all sorts of bench work. He pointed to the printing industry as a place where functionally deaf people are widely employed. Plaintiff could also do clerical work, packaging, and assembly. Dr. Leshner testified that plaintiff possessed the skills to perform all of these jobs. He added that they would constitute downgrading from his previous employment, which he could not accept without psychiatric help, but that he could perform them with its aid. We credit Dr. Leshner's testimony.[16]

Based upon plaintiff's background and personality we find that plaintiff would have worked until he was past 62 years of age, or another 14 years from date. We find that, because of his disability, he will, after rehabilitation, be gainfully employed but with a reduction in earning capacity of 30%. Over his work life expectancy this will result in a loss of earning capacity, after reduction to present worth at 6% simple interest in accordance with Pennsylvania law, in the sum of $69,250.[17]

Needless to say, plaintiff's pain and suffering is not capable of precise measure-

---

12. Dr. Lee-Benner testified that plaintiff suffered from "psychotic depression."

13. Dr. Peters defined that term as an obsessive, compulsive personality disorder: *e. g.*, obsessed with having to succeed, but feeling that he is a failure.

14. Neither physician testified that plaintiff is unemployable because of his hearing loss as opposed to his resulting psychiatric condition.

15. The parties have stipulated that this is the amount of past loss should we find plaintiff *totally disabled to date.*

16. Dr. Leshner expressed his belief that plaintiff, a machinist, could have become a tool and die worker at a considerably higher wage. We are not persuaded and refrain from so finding.

17. Included in this award is the full amount of plaintiff's lost earning capacity for one year hence, during which time he will require psychiatric care in order to be rehabilitated. We calculate future loss of earning capacity on the basis of the $14,183 per year the parties have stipulated the plaintiff would now be earning. Pennsylvania law *does not cognize an inflationary or productivity factor for future earnings loss. See Havens v. Tonner*, 243 Pa.Super. 371, 365 A.2d 1271 (1976).

ment. While his mental suffering should abate with treatment, it has been acute from June 1968 to the present. We reincorporate here our previously stated detailed findings about the destruction of the fabric of plaintiff's personal and family life. And we note again that plaintiff is constantly depressed; he no longer goes to his lodge where he was once extremely active; he eschews fishing, bowling, and other recreational activities which he used to enjoy; he is constantly irritable.

Unlike the psychiatric problems, the tinnitus (constant ringing in the ears) is a disconcerting, indeed tormenting, phenomenon which merits independent consideration as an item of damage. However, even that pales by comparison with the deafness which will never abate. No purpose would be served by discoursing with emotion about the spectre of deafness, for any human being can grasp, at least in some measure, its travail. Having seen the plaintiff labor under his disability and having heard testimony of its impact on him is sufficient for us to grasp the magnitude of his tragedy. Plaintiff was a normal human being living a full life; today he is but a shell of his former self. We find that a fair and reasonable sum to compensate the plaintiff for past pain and suffering is $75,000 and that a fair and reasonable sum to compensate plaintiff for his future pain and suffering over his life expectancy [18] is $75,000. Additionally, we find plaintiff has incurred past medical expense in the sum of $286 to Dr. Sataloff and $2,000 to Dr. Lee-Benner.[19] Finally, we find that he will require the sum of $5,000 for psychiatric treatment in the future in order to effect rehabilitation so that he can resume gainful employment and a more normal family and personal life.

We turn now to the applicable principles of law.

## III. Discussion

### A. The Statute of Limitations

 As we have noted in the Preliminary Statement, the Act's statute of limita-

tions bars claims against the United States except where they are presented in writing within two years after the claim accrues. The determination of when a claim accrues is a matter of federal, not state law. Tyminski v. United States, 481 F.2d 257, 262 (3d Cir. 1973). The test which has been articulated, with considerable uniformity, to determine "when a claim accrues" is to ascertain the point in time at which the claimant has discovered, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged malpractice. Bridgford v. United States, 550 F.2d 978, 981 (4th Cir. 1977); Ciccarone v. United States, 486 F.2d 253, 256 (3d Cir. 1973); Tyminski v. United States, supra, at 263; Toal v. United States, 438 F.2d 222, 224–25 (2d Cir. 1971); Ashley v. United States, 413 F.2d 490, 492 (9th Cir. 1969); Coyne v. United States, 411 F.2d 987, 988 (5th Cir. 1969); Brown v. United States, 353 F.2d 578, 579 (9th Cir. 1965); Beech v. United States, 345 F.2d 872, 874 (5th Cir. 1965); Kossick v. United States, 330 F.2d 933, 935 (2d Cir.), cert. denied, 379 U.S. 837, 85 S.Ct. 73, 13 L.Ed.2d 44 (1964); Hungerford v. United States, 307 F.2d 99, 102 (9th Cir. 1962); Quinton v. United States, 304 F.2 234, 240 (5th Cir. 1962).

The Quinton court, which originated this rule, derived it from the "blameless ignorance" notion articulated in Urie v. Thompson, 337 U.S. 163, 170, 69 S.Ct. 1018, 1025, 93 L.Ed. 1282 (1949). Judge Tuttle described the Quinton rule as a "sensible and just" alternative to the then majority state court rule that a cause of action for malpractice accrues on the date of the negligent act, even if the injured patient is unaware of his plight.

The Quinton rule has received widespread acceptance; however, the parties here disagree about what it means. The government reads the rule to mean that the statute begins to run, without more, when the plaintiff becomes aware that he has been

---

**18.** Plaintiff's life expectancy is 25 years.

**19.** We also find these sums to be fair and reasonable.

injured as the result of a physician's treatment. The plaintiff, however, contends that the physician's conduct cannot be described as "acts constituting malpractice" until the patient, concededly being required to apply reasonable diligence, has some reason to believe that the acts which caused him injury may have been negligent. The government rejoins that the plaintiff has semantically toyed with the rule, converting it into one under which the statute does not begin to run until he discovers that the acts constitute malpractice.

■ The foregoing dialogue suggests to us that the syntax of the *Quinton* rule is less than crystal clear and that the rule cannot be given a definite literal meaning. The problems with literal interpretation are, *inter alia,* demonstrated by the case where the conclusion that acts of a physician which produced pain or injury are negligent requires a sophisticated, medically informed judgment. In reading *Quinton* as requiring only a confluence of act, injury, and cause which were known, or should reasonably have been known to plaintiff, the government thus appears to suggest that *Quinton* posits a strong if not irrebuttable presumption that knowledge of the causal relationship between treatment and injury is sufficient to alert a reasonable man that there may have been negligence in his treatment and that he should therefore bring suit. The plaintiff disagrees. In his view, where the patient has exercised reasonable diligence in ascertaining the cause of his injury and where the investigation, while demonstrating the relationship between his treatment and injury, reveals no negligence, the statute does not begin to run, just as in the case where a patient was aware that a negligent act was performed but unaware that the act caused him harm.[20]

We believe that the government's reading of *Quinton* is simplistic and conceptually inaccurate, particularly given the "blameless ignorance" roots of the *Quinton* rule. It would certainly appear to make little sense to limit the application of the *Quinton* rule to only certain kinds of blameless ignorance. In *Urie, supra,* the Supreme Court did not believe that the plaintiff, asserting a FELA claim, should be bound to a running statute of limitations period until his disease (silicosis), the subject of his claim, became evident. The court reasoned that "blameless ignorance" should not result in a deprivation of rights, explaining that "the traditional purposes of the statutes of limitations . . . conventionally require the assertion of claims within a specified period of time *after the notice of invasion of legal rights.*" 337 U.S. at 170, 69 S.Ct. at 1025 (emphasis added). Until negligence reasonably appears, a plaintiff has no notice that his rights have been invaded. As a practical matter it would be unreasonable to require, or even suggest for protective purposes, that one who is unaware after reasonable investigation that a physician's conduct breached a legal duty to him must file suit alleging that some duty was breached. Thus where negligence is such as to escape the notice of one who reasonably investigates, we believe *Urie* teaches that the limitations period should not yet begin to run. *See also* n. 20, *supra.*

■ We agree with plaintiff, that where the patient perceives the relationship be-

---

20. Such a case, and one inveighing against the government's simplistic reading of *Quinton,* is *Portis v. United States,* 483 F.2d 670 (4th Cir. 1973), remarkably similar in some aspects to the case at bar. In *Portis,* the parents of the minor plaintiff learned in October 1963 that an Air Force nurse had erroneously administered neomycin hypodermically rather than orally as instructed. They did not learn, however, until 1969, that this earlier negligence on the part of the government employee had caused their daughter's loss of hearing. Rather than holding that the statute of limitations began to run in 1963 when they learned of the acts constituting the alleged negligence—as a literal application of the accrual rule would seem to require—the Court held that the "cause of action for malpractice resulting in deafness did not accrue until 1969." 483 F.2d at 673. The basis of the decision was that until 1969 the plaintiff and her parents were blamelessly ignorant of the fact that the improper administration of neomycin was the proximate cause of plaintiff's deafness and that it therefore would have been unreasonable to require them to bring suit earlier.

tween treatment and injury but, notwithstanding diligence, has no reason to believe that there was any negligence in the treatment, the statute does not begin to run. Put differently, we read the *Quinton* test, adopted by the Third Circuit in *Tyminski*, as creating a *rebuttable* presumption that knowledge of the causal relationship between treatment and injury is sufficient to alert a reasonable person that there may have been negligence related to treatment. Before finalizing this analysis we must examine the cases relied on by the government, to support its interpretation of *Quinton*, and other important cases in this area.

In *Tyminski v. United States, supra,* the veteran was admitted to a VA hospital because of difficulty in walking and increasing pain in his right side. A diagnosis was made that there was a (congenital) space-taking lesion of the thoracic area of the spinal cord known as an arteriovenus angioma (AVA). After exploratory surgery, Tyminski became paraplegic. The Court of Appeals recounted the pertinent facts as follows:

> Tyminski was persistently informed by the [VA] physicians that the paraplegia was due to the natural progression of the congenital AVA. The District Court, however, found that the paraplegia was caused by post-operative bleeding within the operative site which collected in the space outside the dura, forming an epidural hematoma and causing pressure on the spinal cord. The pressure of the hematoma created a block of the spinal cord. An epidural hematoma in these circumstances, the District Court found, requires immediate treatment consisting of a second operation for the purpose of removing the accumulated blood and stopping the source of the bleeding. The failure to re-operate and stop the post-operative bleeding was found to be the proximate cause of the paraplegia. The defendant's negligence consisted in failing to recognize the symptoms of paralysis as caused by the hematoma and in failing to re-operate and stop the post-operative bleeding. [481 F.2d at 260]

After his discharge from the hospital, Tyminski sought assiduously to establish a "service-connected disability that aggravated [his] condition and sent [him] to the hospital for treatment." *Id.* His efforts found his way to the VA. (Like Kubrick he was aided by various service organization representatives, and also some Congressmen.) However, the VA denied relief, refusing to increase his disability rating and assuring him (much as they did Kubrick) that the condition was no fault of the VA. Various appeals, in one of which "an error in medical judgment" was averred, also came to naught; the VA continued to tell Tyminski that it had committed no malpractice in that his paraplegia resulted from natural progression of the AVA. Suit was not brought until 10 years after the initial AVA surgery.

Adopting the *Quinton* formulation, the Third Circuit upheld the finding of the District Judge that Tyminski's action (brought two years prior to his death) was not time-barred against the government's contentions that by no later than June 9, 1964, two and one-half years before the action was filed, Tyminski believed that there was or may have been negligence arising from his surgery in the VA hospital. In dealing with the government's contention, the Court of Appeals first addressed the initial question whether Tyminski knew more than two years before suit was brought that there had been post-operative bleeding in the operative site resulting in the formation of hematoma with the awareness that the hematoma caused the paralysis. The Court stated:

> Only the knowledge that these acts occurred would preclude Tyminski from asserting that he did not discover the acts constituting the alleged malpractice. In each of the medical malpractice cases which have applied the federal rule of accrual of claims the inquiry by the court has been focused on the specific acts upon which the claim for malpractice was based. *See e. g., Toal v. United States, supra* (known retention of pantopaque, an iodized radiopaque contrast medium used in myelograms, in the plaintiff's lumbar

sac); *Ashley v. United States, supra* (use of a needle to draw blood from plaintiff's arm resulting in nerve damage); *Brown v. United States, supra,* (use of excessive oxygen known to have caused infant's blindness). The record amply supports the conclusion that Tyminski did not discover the acts constituting the malpractice more than two years before the action was brought. [481 F.2d 263–64].

Turning then to the remaining focus of its inquiry, *i. e.,* whether Tyminski should, in the exercise of reasonable diligence have discovered the "acts" constituting malpractice, the Court of Appeals concluded that Tyminski had exercised reasonable diligence because of his persistence in attempting to ascertain some medical basis for increasing his disability payments. The Court also concluded that his failure to discover earlier the acts constituting malpractice was not unreasonable because of: (1) the government's failure to inform him that injury might result from the operation; (2) his reasonable belief that the injuries resulted from the natural progression of the pre-existing congenital spine tumor; and (3) the persuasiveness of the medical opinions of the VA physicians that the natural progression of the AVA caused his problems. In this regard, the Court also stated:

> The unanimous determination by the persons reviewing Tyminski's claim that the injuries were due to the AVA is telling evidence supporting the conclusion that Tyminski in the exercise of reasonable diligence should not have discovered the existence of the acts of malpractice upon which his claim in the District Court was based. [*Id.* at 265]

Tyminski's claims were thus held not to be time barred.

Notwithstanding the government's reliance on *Tyminski,* that case is helpful to the plaintiff in many respects, especially in terms of the following factors: (1) plaintiff's diligence in pursuing the medical cause of his deafness and in seeking vindication before the VA; and (2) the persuasiveness of the VA doctors frequent reaffirmations to him that there was no medical error committed by the VA. The Third Circuit did not find *Tyminski's* persistence pursuing his claim before the VA or even his scattershot allegations of negligence sufficient to bar his claim and neither do we with respect to Kubrick. However, we must return to our conceptual analysis.

We find that *Tyminski* demonstrates the difficulties of defining the notion of "acts constituting malpractice." The Court's opinion relates that notion to the post-operative bleeding of which plaintiff was unaware. But was that bleeding an "act of malpractice" distinguishable from the negligence of the doctors in failing to recognize that the symptoms of paralysis were caused by the hematoma and in failing to reoperate and stop the bleeding? In such a case it may be that a plaintiff cannot discover the act which was the cause of his injury without also discovering (or suspecting) negligence. Thus *Tyminski* itself calls into question whether the concept of "acts constituting malpractice" can be meaningful apart from a unitary test whereby the extent to which a plaintiff must at least have reason to suspect that negligence occurred is a factor. Indeed, more often than not, there is no "act" constituting malpractice, but rather a *failure* to act which, in turn, is a function of misjudgment about sophisticated and technical medical matters. Such things are inherently difficult for a claimant to perceive in the abstract or without some revelation of negligence.[21]

---

**21.** Reasonably believing that deafness resulted as an unavoidable byproduct of necessary treatment for osteomyelitis is not really very different from reasonably believing, as the plaintiff in *Tyminski* did, that paraplegia resulted from the natural progression of AVA. In neither case can the plaintiff be expected to file a malpractice claim given the limited state of his knowledge. *Ciccarone, supra,* also in the Third Circuit, is not helpful to the government because it emanates from a simple factual context with a direct relationship between a blue dye injection and the deterioration of plaintiff's health and because the Court found that plaintiff was sophisticated in such matters and had consulted competent counsel within the two-year period.

Other circuits which have faced factual situations akin to those at bar have injected into the equation the ingredient of plaintiff's realization that there "may have been negligence." In *Brown v. United States, supra,* the Ninth Circuit said that the statute began to run when the plaintiff was "informed as to the exact nature of the disability and its relationship to prior medical treatment," which the court found to represent *"knowledge of facts sufficient to alert a reasonable person that there may have been negligence . . . ."* 353 F.2d at 580 (emphasis added). And in *Reilly v. United States,* 513 F.2d 147 (8th Cir. 1975), the Court ruled that the plaintiff had knowledge sufficient "to alert a reasonable person that there may have been negligence related to the treatment . . .," invoking the duty diligently to file a claim. *Id.* at 150.

*Brown* and *Reilly* reinforce our view of the following: that while the premise of *Quinton* is that knowledge of the causal relationship between treatment and injury is generally sufficient to alert a reasonable person that there may have been negligence related to the treatment, this presumption of sufficiency cannot be deemed to be an irrebuttable one; that the exception often proves the rule; and that *Quinton* must be applied on an ad hoc basis in each case.

An important illustration of our point may be found in *Jordan v. United States,* 503 F.2d 620 (6th Cir. 1974). Jordan, a one-eyed World War II veteran, entered a Veterans Administration Hospital in November of 1968 to alleviate surgically a chronic sinus condition. *Immediately after the operation* his upper face became swollen to a point where he could not see out of his good eye, the right one. Four or five days later the swelling subsided and Jordan noted that discolored areas appeared below both his good right eye and his artificial left eye. Jordan was also then aware that the pupil of his right eye wandered to the right impairing his vision. Jordan queried a VA physician while hospitalized about his sight, and was told such was the result of muscle damage *caused by the operative pro-* cedures involved in dealing with his sinus condition. Shortly thereafter, upon being discharged from the hospital, Jordan was told to return early in 1969 for corrective eye surgery. Jordan was operated on unsuccessfully in January and February of 1969. In the subsequent months Jordan's eyesight grew progressively worse, forcing him to retire from his job with the Post Office in February, 1970. Jordan continued to return to the VA hospital for treatment of his sinus condition and eye examinations. Finally, on June 7, 1971, during one of his eye examinations, the examining doctor informed him that such visits were no longer necessary as there was nothing they could do for the eye, and that it was *"too bad they screwed up your eye when they operated on your nose." Id.* at 621 (emphasis added). Jordan retained a lawyer who filed a claim on his behalf with the VA on June 1, 1972.

The government, as in this case, filed a Motion to Dismiss or in the alternative for Summary Judgment on the grounds that plaintiff knew that treatment he received while in a VA hospital four years prior resulted in his injury and therefore the statute of limitations had expired. That motion was granted by the District Court.

The Court of Appeals, in reinstating Jordan's Complaint, specifically rejected the government's argument that knowledge that the treatment rendered caused the injury (*i. e.,* knowledge of causation without more) triggered the limitation period. Although the evidence contained in the record proved that Jordan knew in November 1968 that his loss of sight was a result of muscle damage sustained in the sinus operation, he was unaware that the result was because of improper performance until June 7, 1971. The Court held that the statute of limitations had not expired because plaintiff was blamelessly ignorant of the act of malpractice prior to June 7, 1971:

> It [the evidence] failed to show that this appellant, in the exercise of reasonable diligence, should have been aware that the muscle damage may have been the result of the *improper performance* of his

sinus operation. Contrary to the characterization of the district court and the government, neither the unsuccessful eye operations nor the other events established by the record signified that anything had been done incorrectly in November, 1968. They indicated only that appellant's injury was causing his loss of vision and was apparently permanent, but not that it was the result of malpractice. Moreover, these developments were not inconsistent with appellant's belief that the loss of his vision was the inevitable consequence of the proper procedures used by the doctors to treat his "severe" sinus condition during the November, 1968 operation. Thus they provided no clue that his belief, though based on a VA doctor's response to his questions, might be incorrect. [*Id.* at 624 (emphasis added).]

*Jordan* is quite similar to the case at bar.

As with the blindness that beset Jordan, the unusual and unexpected occurrence of deafness required Kubrick to seek medical treatment and a diagnosis of its cause. In both cases, the explanations received consistently indicated an injury possibly compensable by an increased disability rating, though an injury that had occurred through no fault on the part of the Veterans Administration. Kubrick filed his claim trying to receive compensation he thought to be his due. As was the fate of Jordan, Kubrick was misled into believing that his loss was not caused by any fault of the Veterans Administration. The actions of Kubrick were not dissimilar to the actions of any unknowing layman unaware that an act of malpractice has been perpetrated upon him. Even more diligent than Jordan, Kubrick consulted with private physicians to ascertain the facts concerning his situation, but blamelessly remained ignorant of the act of malpractice until June 2, 1971, when Dr. Soma informed him that neomycin should not have been administered to him. The diligence factor is a most important one. Indeed, we believe that *Brown* and *Ashley* can be distinguished because the claimants there failed to investigate unusual or unexpected occurrences.

In legal terms we have concluded that the *Quinton* test creates a rebuttable presumption that knowledge of the causal relationship between treatment and injury is sufficient to alert a reasonable person that there may have been negligence related to treatment. We believe this formulation to be responsive to the Third Circuit's thinking as reflected in its recent cases. This conclusion does not transform *Quinton* into a purely subjective standard dependent on a plaintiff's state of mind; such a construction would promote stale claims against which it would be increasingly difficult to defend.[22] To the contrary, it construes *Quinton* as positing an objective or reasonable man standard in which the success of a plaintiff in tolling the statute depends not only upon his exercising reasonable diligence, but also upon his establishing that there was no reasonable suspicion that there was negligence in his treatment. For, as we have said above, we do not believe it reasonable to start the statute running until the plaintiff had reason at least to suspect that a legal duty to him had been breached.

Turning to factual considerations, we have found: (1) that plaintiff exercised all kinds of reasonable diligence in attempting to establish a medical basis for increased disability benefits; (2) that the results of his inquiry contraindicated negligence; and (3) that because of the technical and obscure nature of the medical problem (involving the propensity of the body to absorb a toxic antibiotic under a given mode of administration) the plaintiff could not be expected to draw any meaningful inferences that there had been negligence in his treatment, or even to suspect it. Under these circumstances, we conclude that the plaintiff has rebutted the *Quinton* presumption, and cannot be deemed to have known of the "acts constituting malpractice" until his visit to Dr. Soma in June

22. Indeed, in this case, Dr. Wetherbee, the attending surgeon, has died.

1971. Since plaintiff's claim thus accrued in June 1971, and since the plaintiff's administrative claim was filed in January 1973, this suit (filed in September 1972) is not barred by the statute of limitations.[23] We turn now to the substantive malpractice issues.

### B. *The Malpractice Issues*

#### 1. *The Applicable Standard of Law*

■ The substantive malpractice issues before us are, of course, governed by the Pennsylvania law. 28 U.S.C. § 1346(b); *Ciccarone v. United States, supra.* We must therefore examine the Pennsylvania standard of care.

■ Dr. Wetherbee held himself out as a specialist. We believe that Pennsylvania law provides that a specialist owes to his patient a higher standard of skill, learning and care than a general practitioner. The specialist:

is expected to exercise that degree of skill, learning, and care normally possessed and exercised by the average physician who devotes special study and attention to the diagnosis and treatment of [particular] diseases. Due regard must of course be shown to the advanced state of

the profession at the time of the diagnosis or treatment. [Footnote omitted.]

*McPhee v. Reichel,* 461 F.2d 947, 951 (3d Cir. 1972). The *McPhee* formulation represents the Third Circuit's prediction as to Pennsylvania law in the absence of a clear Pennsylvania Supreme or Superior Court holding on the subject. The *McPhee* Court commented, however:

This charge conforms with the Pennsylvania practice of alerting the jury to the fact that a defendant who is a specialist should be held to a higher degree of care than a general practitioner. The case law and scholarly comment also support this instruction. Laub's Pennsylvania Trial Guide, Physicians and Surgeons, Chapter 2, § 21, Pp. 258-9. [Footnote omitted.]

*McPhee* does not specifically refer to the trichotomy in the malpractice case law—those cases which require physicians to adhere to the standard of skill and learning and care practiced by the average physician in the same (and only the same) locality; the cases which expand the reference to encompass the same locality and any similar locality; and the line of cases which measures the physician conduct against a "national standard." Neither has the Pennsylvania Supreme Court formally addressed the question,[24] although it has for a number

---

**23.** The government has cited to us *Rosario v. United States,* 531 F.2d 1227 (3d Cir. 1976), in support of its argument that we lack subject-matter jurisdiction over plaintiff's action because he failed to comply with 28 U.S.C. § 2675(a) requiring him to file an administrative claim prior to instituting suit. As indicated in our findings of fact (*supra*), plaintiff's complaint was filed on September 14, 1972, and his form 95 administrative claim was filed on January 13, 1973 and rejected on April 13, 1973. Obviously, the administrative filing did not precede institution of this suit, but that filing did occur within two years of the accrual of plaintiff's claim so that the "appropriate Federal agency [did receive a claim presented in writing] within two years after such claim accrue[d]." 28 U.S.C. § 2401. The government's sole objection, therefore, is to the fact that this suit was filed before the final disposition of the administrative proceeding.

*Rosario* certainly confirms that a § 2675(a) filing is a jurisdictional prerequisite to an ac-

tion against the United States under the Federal Torts Claim Act, but that case involved a failure to file any administrative claim and does not support the government's argument in the present case. It is our view that where the action is pursued to conclusion in federal court, even though its filing preceded a timely administrative claim, and where the administrative claim is disposed of prior to trial and decision in the federal suit, that suit is ratified, as it were, and the jurisdictional prerequisites are met, thus mooting the government's arguments of lack of subject-matter jurisdiction. To hold otherwise would be to elevate form over substance and erroneously presume a legislative intent to bar a plaintiff's claim purely because he did not go through the technical procedure of refiling a complaint which was already before the Court.

**24.** *Incollingo v. Ewing,* 444 Pa. 263, 282 A.2d 206, 214 n.5a (1971), expressly left open the question whether Pennsylvania would continue to abide by the similar locality rule.

of years followed the similar locality rule with respect to general practitioners.[25] Whatever may be said for the reasonableness of similar locality rules circa 1977,[26] they cannot reasonably be said to apply to those practitioners of the healing art to whom the general practitioner refers patients with ailments which are unusually complex or intractable or which pose a threat to well-being or life itself.

The language of the Maryland Supreme Court in *Shilkret v. Annapolis Emergency Hospital Association*, note 26 *supra*, is apposite here:

Were we to adopt a standard tied to locality for specialists, we would clearly be ignoring the realities of medical life. As we have indicated, the various specialties have established uniform requirements for certification. The national boards dictate the length of residency training, subjects to be covered, and the examinations given to the candidates for certification. Since the medical profession itself recognizes national standards ty rules no longer exists. The modern physician bears little resemblance to his predecessors. As we have indicated at length, the medical schools of yesterday could not possibly compare with the accredited institutions of today, many of which are associated with teaching hospitals. But the contrast merely begins at that point in the medical career: vastly superior postgraduate training, the dynamic impact of modern communications and transportation, the proliferation of medical literature, frequent seminars and conferences on a variety of professional subjects, and the growing availability of modern clinical facilities are but some of the developments in the medical profession which combine to produce contemporary standards that are not only much higher than they were just a few short years ago, but also are national in scope.

349 A.2d at 249, 252 (footnote omitted).

Several cases supporting the national standard of care for specialists, most of which are referred to in *Shilkret*, are as follows: *Karp v. Cooley*, 493 F.2d 408, 423 (5th Cir. 1973), *cert. denied*, 419 U.S. 845, 95 S.Ct. 79, 42 L.Ed.2d 73 (1974) (Texas law); *Ayers v. Parry*, 192 F.2d 181, 184 (3d Cir. 1951), *cert. denied*, 343 U.S. 980, 72 S.Ct. 1081, 96 L.Ed. 1371 (1952) (New Jersey law); *Bruni v. Tatsumi*, 46 Ohio 2d 127, 346 N.E.2d 673, 676 (1976); *Kronke v. Danielson*, 108 Ariz. 400, 499 P.2d 156, 159 (1972); *Christy v. Saliterman*, 288 Minn. 144, 179 N.W.2d 288, 302 (1970); *Naccarato v. Grub*, 384 Mich. 248, 180 N.W.2d 788, 790–91 (1970) (grounded principally upon reliance and expectations of the public); *Brune v. Belinkoff*, 354 Mass. 102, 235 N.E.2d 793, 798 (1968). There are, however, cases of recent vintage which adhere to the similar community standard: *e. g.*, *Kortus v. Jensen*, 195 Neb. 261, 237 N.W.2d 845, 850 (1976); *Little v. Cross*, 217 Va. 71, 225 S.E.2d 387, 390 (1976); *Coleman v. Garrison*, 349 A.2d 8 (Del.1975) (where it appears that defendant was a gynecological surgeon although his status as a specialist is not discussed).

---

25. *See, e. g., Smith v. Yohe*, 412 Pa. 94, 194 A.2d 167, 170 (1963); *Donaldson v. Maffucci*, 397 Pa. 548, 156 A.2d 835 (1959). In these cases the Court in enunciating the similar locality rule articulated it as applicable to "a physician *who is not a specialist* . . . ." (Emphasis added.)

26. In *Shilkret v. Annapolis Emergency Hospital Ass'n.*, 276 Md. 187, 349 A.2d 245 (1975), the Court of Appeals of Maryland traced the origins of the strict locality rule, noting the grounds on which it has been attacked. The Court also traced the history of the similar locality rule and the national standard, surveying the jurisdictions following the various rules. The Maryland Court's treatment is impressive. We agree with the Maryland Court that the justification underlying the development of the locality and similar locality rules have been eroded by collateral developments in medical education and broad societal change. As the Court noted:

Whatever may have justified the strict locality rule fifty or a hundred years ago, it cannot be reconciled with the realities of medical practice today. "New techniques and discoveries are available to all doctors within a short period of time through medical journals, closed circuit television presentations, special radio networks for doctors, tape recorded digests of medical literature, and current correspondence courses." Note, *An Evaluation of Changes In The Medical Standard of Care*, 23 Vand.L.Rev. 729, 732 (1970). More importantly, the quality of medical school training itself has improved dramatically in the last century. Where early medical education consisted of a course of lectures over a period of six months, which was supplemented by apprenticeships with doctors who had even less formal education, there now exists a national accrediting system which has contributed to the standardization of medical schools throughout the country. *Id* n.16. [Footnote omitted.]

. . . . .

We agree with these courts [*see* citations which follow] that justification for the locali-

188

for specialists that are not determined by geography, the law should follow suit [*Id.* 349 A.2d at 251].

We cannot conceive that the highest Court of Pennsylvania, a state containing numerous medical schools, including some of the nation's most prestigious, would fail to adopt the national standard for specialists. ▮ Our observation as to the direction of the law is consistent with *McPhee*, which by our reading articulates a complete description of the standard of care required of a specialist, yet does not include a "similar locality" restriction. It is also consistent with our independent reading of the Pennsylvania malpractice cases involving general practitioners, which in applying a similar locality standard seem to highlight that the standard applies to general practitioners only.[27] In short, we predict that the Pennsylvania Supreme Court will apply a national standard to specialists.[28]

▮ There is another principle in the Pennsylvania law of medical malpractice which must be noted because the government relies upon it in this case: that a physician is not liable for a mere error of judgment. *Smith v. Yohe*, 412 Pa. 94, 194 A.2d 167, 170 (1963). This rule is obviously a function of the fact that there are so many elements which enter into a determination of treatment, including the factor of judgment, that faulty treatment will not constitute malpractice if the physician has exercised the skill and knowledge required by the standard to which he is subject and if his judgment takes into account all of the various factors available to him. If, however, he breaches the standard of care (or if the error of judgment is so gross as to be inconsistent with the degree of skill and knowledge which it is the duty of a physician to possess), then, as in this case, the error of judgment doctrine is of no avail.

We turn now to the application of the law to the facts.

2. *Did the Treating Physician Meet the Standard?*

As we noted at the outset, the alleged medical malpractice in this case stems principally from Dr. Wetherbee's lack, not of skill in diagnosis or treatment as such, but of knowledge of the properties of neomycin. In order to determine whether Dr. Wetherbee's treatment met the Pennsylvania standard of what specialists should know, we incorporate here our findings of fact on the extent of knowledge in the medical community as to the capacity of neomycin to be absorbed into the body tissues and bloodstream from a post-surgical wound irrigating solution. Those findings tell us that Dr. Wetherbee's lack of knowledge, and his concomitant treatment, violated the national standard for specialists because of the generalized knowledge in the national community of orthopedic specialists of the hazards of neomycin and of its potentiality for absorption in circumstances such as those created by Dr. Wetherbee's use of neomycin in 1% irrigating solution through a closed hemovac system (at least in such high and lengthy dosage). However, even if a similar locality standard were to be applied, our findings of fact support the conclusion that the information in question was available to or known by the average specialist in Wilkes-Barre to the same or similar extent as the average specialist in Philadelphia. Wilkes-Barre, after all, is hardly a remote outpost of civilization. It is the commercial and industrial hub of the populous Wyoming Valley, adjacent to the Scranton metropolitan area from which the plaintiff hails.[29] And the Scranton Wilkes-Barre area is only two hours by automobile from either Philadelphia or New York. Special-

---

27. Note 25 *supra.*

28. While not a basis for our decision in holding specialists to a national standard of care, we raise the question whether VA Hospitals, which are part of a national system, are not perforce bound to a national standard by their very nature.

29. The combined population of Luzerne and Lackawanna Counties of which Wilkes-Barre and Scranton respectively are the County seats is over 576,000.

ists in Wilkes-Barre receive the same medical journals as those in Philadelphia and New York, attend the same specialist conventions, etc.

■ In sum, our findings from the evidence compel the legal conclusion that Dr. Wetherbee violated the standard of care imposed upon him by law because he administered excessive quantities of neomycin to the plaintiff over an extended period of time through an imperfectly functioning hemovac tube system, and also because he failed to utilize polycillin (ampicillin) or penicillin, the true drugs of choice in the situation, given the ototoxic hazards of neomycin. While on a national standard the plaintiff would have succeeded by a very substantial margin, because of these conclusions, under the similar locality test, plaintiff has at least established his case by a fair preponderance of the evidence.[30] Finally, we conclude that what was involved was not mere error in judgment but a lack of skill or knowledge as measured, of course, by the level of medical knowledge in April, 1968.

IV. *Conclusion*

■ We have found that plaintiff's administrative form 95 claim was timely filed and have concluded that this suit, although begun prior to his administrative claim, was not vitiated where the complaint was still on the docket after the rejection of the administrative claim. We have found that Dr. Wetherbee breached the standard of care with which he is charged by Pennsylvania law and that as the proximate result of his negligence, the plaintiff suffered a severe bilateral sensorineural hearing loss as well as serious emotional problems. And we have found that plaintiff is entitled to recover damage for his past lost earnings, loss of future earning capacity, past and future pain and suffering, and past and future medical expense in the total sum of $320,536.00. Accordingly, we enter the following Order.

30. We note that the doctor's failure to use the (correct) drug of choice does not appear to implicate any difference between a national and similar locality standard. Neither would his permitting a poorly functioning hemovac tube system to continue in operation. And if the nurses were responsible for permitting the hemovac tube system to fail that would not help the government which is responsible for their conduct.